GEORGIA O'KEEFFE, PLAINTIFF-RESPONDENT, v. BARRY SNYDER, D/B/A PRINCETON GALLERY OF FINE ART, DEFENDANT-APPELLANT, AND ULRICH A. FRANK, THIRD PARTY DEFENDANT-APPELLANT.

Argued February 19, 1980—Decided July 17, 1980.

*Joel H. Sterns* argued the cause for appellant Barry Snyder, d/b/a Princeton Gallery of Fine Art (*Sterns, Herbert and Weinroth*, attorneys; *Mark D. Schorr* and *William J. Bigham*, on the briefs).

*Thomas C. Jamieson, Jr.*, argued the cause for appellant Ulrich A. Frank (*Jamieson, McCardell, Moore, Peskin and Spicer*, attorneys).

*Roger A. Lowenstein* argued the cause for respondent (*Lowenstein, Sandler, Brochin, Kohl, Fisher and Boylan*, attorneys; *Mr. Lowenstein* and *Lee Hilles Wertheim*, on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

This is an appeal from an order of the Appellate Division granting summary judgment to plaintiff, Georgia O'Keeffe, against defendant, Barry Snyder, d/b/a Princeton Gallery of Fine Art, for replevin of three small pictures painted by O'Keeffe. *O'Keeffe v. Snyder*, 170 *N.J.Super.* 75 (1979). In her complaint, filed in March, 1976, O'Keeffe alleged she was the owner of the paintings and that they were stolen from a New York art gallery in 1946. Snyder asserted he was a purchaser for value of the paintings, he had title by adverse possession, and O'Keeffe's action was barred by the expiration of the six-year period of limitations provided by *N.J.S.A.* 2A:14–1 pertaining to an action in replevin. Snyder impleaded third party defendant, Ulrich A. Frank, from whom Snyder purchased the paintings in 1975 for $35,000.

The trial court granted summary judgment for Snyder on the ground that O'Keeffe's action was barred because it was not commenced within six years of the alleged theft. The Appellate Division reversed and entered judgment for O'Keeffe. *O'Keeffe, supra*, 170 *N.J.Super.* at 92. A majority of that court concluded that the paintings were stolen, the defenses of expiration of the statute of limitations and title by adverse possession were identical, and Snyder had not proved the elements of adverse possession. Consequently, the majority ruled that

·O'Keeffe could still enforce her right to possession of the paintings.

The dissenting judge stated that the appropriate measurement of the period of limitation was not by analogy to adverse possession, but by application of the "discovery rule" pertaining to some statutes of limitation. He concluded that the six-year period of limitations commenced when O'Keeffe knew or should have known who unlawfully possessed the paintings, and that the matter should be remanded to determine if and when that event had occurred. *Id.* at 96–97.

We granted certification to consider not only the issues raised in the dissenting opinion, but all other issues. 81 *N.J.* 406 (1979). We reverse and remand the matter for a plenary hearing in accordance with this opinion.

I

The record, limited to pleadings, affidavits, answers to interrogatories, and depositions, is fraught with factual conflict. Apart from the creation of the paintings by O'Keeffe and their discovery in Snyder's gallery in 1976, the parties agree on little else.

O'Keeffe contended the paintings were stolen in 1946 from a gallery, An American Place. The gallery was operated by her late husband, the famous photographer Alfred Stieglitz.

An American Place was a cooperative undertaking of O'Keeffe and some other American artists identified by her as Marin, Hardin, Dove, Andema, and Stevens. In 1946, Stieglitz arranged an exhibit which included an O'Keeffe painting, identified as Cliffs. According to O'Keeffe, one day in March, 1946, she and Stieglitz discovered Cliffs was missing from the wall of the exhibit. O'Keeffe estimates the value of the painting at the time of the alleged theft to have been about $150.

About two weeks later, O'Keeffe noticed that two other paintings, Seaweed and Fragments, were missing from a storage room at An American Place. She did not tell anyone, even Stieglitz, about the missing paintings, since she did not want to upset him.

Before the date when O'Keeffe discovered the disappearance of Seaweed, she had already sold it (apparently for a string of amber beads) to a Mrs. Weiner, now deceased. Following the grant of the motion for summary judgment by the trial court in favor of Snyder, O'Keeffe submitted a release from the legatees of Mrs. Weiner purportedly assigning to O'Keeffe their interest in the sale.

O'Keeffe testified on depositions that at about the same time as the disappearance of her paintings, 12 or 13 miniature paintings by Marin also were stolen from An American Place. According to O'Keeffe, a man named Estrick took the Marin paintings and "maybe a few other things." Estrick distributed the Marin paintings to members of the theater world who, when confronted by Stieglitz, returned them. However, neither Stieglitz nor O'Keeffe confronted Estrick with the loss of any of the O'Keeffe paintings.

There was no evidence of a break and entry at An American Place on the dates when O'Keeffe discovered the disappearance of her paintings. Neither Stieglitz nor O'Keeffe reported them missing to the New York Police Department or any other law enforcement agency. Apparently the paintings were uninsured, and O'Keeffe did not seek reimbursement from an insurance company. Similarly, neither O'Keeffe nor stieglitz advertised the loss of the paintings in Art News or any other publication. Nonetheless, they discussed it with associates in the art world and later O'Keeffe mentioned the loss to the director of the Art Institute of Chicago, but she did not ask him to do anything because "it wouldn't have been my way." O'Keeffe does not contend that Frank or Snyder had actual knowledge of the alleged theft.

Stieglitz died in the summer of 1946, and O'Keeffe explains she did not pursue her efforts to locate the paintings because she was settling his estate. In 1947, she retained the services of Doris Bry to help settle the estate. Bry urged O'Keeffe to report the loss of the paintings, but O'Keeffe declined because "they never got anything back by reporting it." Finally, in 1972, O'Keeffe authorized Bry to report the theft to the Art

Dealers Association of America, Inc., which maintains for its members a registry of stolen paintings. The record does not indicate whether such a registry existed at the time the paintings disappeared.

In September, 1975, O'Keeffe learned that the paintings were in the Andrew Crispo Gallery in New York on consignment from Bernard Danenberg Galleries. On February 11, 1976, O'Keeffe discovered that Ulrich A. Frank had sold the paintings to Barry Snyder, d/b/a Princeton Gallery of Fine Art. She demanded their return and, following Snyder's refusal, instituted this action for replevin.

Frank traces his possession of the paintings to his father, Dr. Frank, who died in 1968. He claims there is a family relationship by marriage between his family and the Stieglitz family, a contention that O'Keeffe disputes. Frank does not know how his father acquired the paintings, but he recalls seeing them in his father's apartment in New Hampshire as early as 1941–1943, a period that precedes the alleged theft. Consequently, Frank's factual contentions are inconsistent with O'Keeffe's allegation of theft. Until 1965, Dr. Frank occasionally lent the paintings to Ulrich Frank. In 1965, Dr. and Mrs. Frank formally gave the paintings to Ulrich Frank, who kept them in his residences in Yardley, Pennsylvania and Princeton, New Jersey. In 1968, he exhibited anonymously Cliffs and Fragments in a one day art show in the Jewish Community Center in Trenton. All of these events precede O'Keeffe's listing of the paintings as stolen with the Art Dealers Association of America, Inc. in 1972.

Frank claims continuous possession of the paintings through his father for over thirty years and admits selling the paintings to Snyder. Snyder and Frank do not trace their provenance, or history of possession of the paintings, back to O'Keeffe.

As indicated, Snyder moved for summary judgment on the theory that O'Keeffe's action was barred by the statute of limitations and title had vested in Frank by adverse possession. For purposes of his motion, Snyder conceded that the paintings had been stolen. On her cross motion, O'Keeffe urged that the

paintings were stolen, the statute of limitations had not run, and title to the paintings remained in her.

## II

In general, cross motions for summary judgment do not "obviate a plenary trial of disputed issues of fact, where such exists; nor do cross-motions constitute a waiver by the litigants to such a trial." *Rotwein et al. v. General Accident Group & Cas. Co.,* 103 *N.J.Super.* 406, 424–425 (Law Div.1968). Cross motions do not warrant granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law. 6 *Moore's Federal Practice* (2d ed. 1976), § 56.13 at 341. Cross motions for summary judgment do not preclude the existence of issues of fact. *Id.* at 345. Although a defendant may assert that, according to his theory of the case, the material facts are undisputed, he must be allowed to show that if plaintiff's theory is adopted there remains a genuine issue of material fact. *See Walling v. Richmond Screw Anchor Co.,* 154 *F.*2d 780, 784 (2d Cir. 1946), *cert.* den. 328 *U.S.* 870, 66 *S.Ct.* 1383, 90 *L.Ed.* 1640 (1946). Where there are cross motions for summary judgment, a party may make concessions for the purposes of his motion that do not carry over and support the motion of his adversary. 6 *Moore's, supra,* § 56.13 at 344. *Eagle v. Louisiana and Southern Life Insurance Company,* 464 *F.*2d 607, 608 (10th Cir. 1972); *Begnaud v. White,* 170 *F.*2d 323, 327 (6th Cir. 1948).

The Appellate Division accepted O'Keeffe's contention that the paintings had been stolen. However, in his deposition, Ulrich Frank traces possession of the paintings to his father in the early 1940's, a date that precedes the alleged theft by several years. The factual dispute about the loss of the paintings by O'Keeffe and their acquisition by Frank, as well as the other subsequently described factual issues, warrant a remand for a plenary hearing. *See Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67 (1954).

In reversing the cross motions for summary judgment, the Appellate Division erred in accepting one of two conflicting versions of material fact: the theft of the paintings in March,

1946 as asserted by O'Keeffe as against the possession of the paintings by the Frank family since the early 1940's. Instead of recognizing the existence of this controversy, the Appellate Division misconstrued Snyder's concession that the paintings had been stolen. That concession was made to enable the trial court to determine Snyder's motion for summary judgment that title had passed by adverse possession. The concession was not available to resolve O'Keeffe's cross motion for summary judgment. Hence, there is an issue of material fact, whether the paintings were stolen, that compels remand for trial.

■ Without purporting to limit the scope of the trial, other factual issues include whether (1) O'Keeffe acquired title to Seaweed by obtaining releases from the legatees of Mrs. Weiner; (2) the paintings were not stolen but sold, lent, consigned, or given by Stieglitz to Dr. Frank or someone else without O'Keeffe's knowledge before he died; and (3) there was any business or family relationship between Stieglitz and Dr. Frank so that the original possession of the paintings by the Frank family may have been under claim of right.

### III

On the limited record before us, we cannot determine now who has title to the paintings. That determination will depend on the evidence adduced at trial. Nonetheless, we believe it may aid the trial court and the parties to resolve questions of law that may become relevant at trial.

■ Our decision begins with the principle that, generally speaking, if the paintings were stolen, the thief acquired no title and could not transfer good title to others regardless of their good faith and ignorance of the theft. *Joseph v. Lesnevich*, 56 *N.J.Super.* 340, 346 (App.Div.1959); *Kutner Buick, Inc. v. Strelecki*, 111 *N.J.Super.* 89, 97 (Ch.Div.1970); *see Ashton v. Allen*, 70 *N.J.L.* 117, 119 (Sup.Ct.1903). Proof of theft would advance O'Keeffe's right to possession of the paintings absent other considerations such as expiration of the statute of limitations.

Another issue that may become relevant at trial is whether Frank or his father acquired a "voidable title" to the paintings under *N.J.S.A.* 12A:2–403(1). That section, part of the Uniform Commercial Code (U.C.C.), does not change the basic principle that a mere possessor cannot transfer good title. 2 *Anderson, Uniform Commercial Code* (2d ed. 1971) § 2–403:6 at 41 (*Anderson*). Nonetheless, the U.C.C. permits a person with voidable title to transfer good title to a good faith purchaser for value in certain circumstances. *N.J.S.A.* 12A:2–403(1). If the facts developed at trial merit application of that section, then Frank may have transferred good title to Snyder, thereby providing a defense to O'Keeffe's action. No party on this appeal has urged factual or legal contentions concerning the applicability of the U.C.C. Consequently, a more complete discussion of the U.C.C. would be premature, particularly in light of our decision to remand the matter for trial.

On this appeal, the critical legal question is when O'Keeffe's cause of action accrued. The fulcrum on which the outcome turns is the statute of limitations in *N.J.S.A.* 2A:14–1, which provides that an action for replevin of goods or chattels must be commenced within six years after the accrual of the cause of action.

The trial court found that O'Keeffe's cause of action accrued on the date of the alleged theft, March, 1946, and concluded that her action was barred. The Appellate Division found that an action might have accrued more than six years before the date of suit if possession by the defendant or his predecessors satisfied the elements of adverse possession. As indicated, the Appellate Division concluded that Snyder had not established those elements and that the O'Keeffe action was not barred by the statute of limitations.

Since the alleged theft occurred in New York, a preliminary question is whether the statute of limitations of New York or New Jersey applies. The New York statute, *N.Y. Civ. Prac. Law* § 214 (McKinney), has been interpreted so that the statute of limitations on a cause of action for replevin does not begin to run until after refusal upon demand for the return of the goods.

*Menzel v. List*, 49 *Misc.*2d 300, 267 *N.Y.S.*2d 804 (Sup.Ct.1966), aff'd as modified, 28 *A.D.*2d 516, 279 *N.Y.S.*2d 608 (App.Div. 1966), third party claim reversed on other grounds, 24 *N.Y.*2d 91, 246 *N.E.*2d 742, 298 *N.Y.S.*2d 979 (Ct.App.1969). Here, O'Keeffe demanded return of the paintings in February, 1976. If the New York statute applied, her action would have been commenced within the period of limitations.

■ The traditional rule to determine which of two statutes of limitations is applicable is that the statute of the forum governs unless the limitation is a condition of the cause of action. *See Marshall v. Geo. M. Brewster & Son, Inc.*, 37 *N.J.* 176 (1962). However, this Court has discarded the mechanical rule that the statute of limitations of the forum must be employed in every suit on a foreign cause of action. *Heavner v. Uniroyal, Inc.*, 63 *N.J.* 130, 140–141 (1973). *Heavner* set out five requirements for barring an action by applying a statute of limitations other than the appropriate New Jersey statute: (1) the cause of action arose in the other state; (2) the parties are all present in and amenable to jurisdiction in the other state; (3) New Jersey has no substantial interest in the matter; (4) the substantive law of the other jurisdiction is applicable, and (5) the limitations' period of the other jurisdiction has expired at the time of the commencement of the suit in New Jersey. *Id.* at 141. The *Heavner* rule provides a limited and special exception to the general rule that the rule of the forum determines the applicable period of limitations. *Raskulinecz v. Raskulinecz*, 141 *N.J.Super.* 148, 153 (Law Div.1976). In the present case, none of the parties resides in New York and the paintings are located in New Jersey. On the facts before us, it would appear that the appropriate statute of limitations is the law of the forum, *N.J.S.A.* 2A:14–1. On remand, the trial court may reconsider this issue if the parties present other relevant facts.

IV

■ On the assumption that New Jersey law will apply, we shall consider significant questions raised about the interpretation of *N.J.S.A.* 2A:14–1. The purpose of a statute of limita-

tions is to "stimulate to activity and punish negligence" and "promote repose by giving security and stability to human affairs". *Wood v. Carpenter,* 101 *U.S.* 135, 139, 25 *L.Ed.* 807, 808 (1879); *Tevis v. Tevis,* 79 *N.J.* 422, 430–431 (1979); *Fernandi v. Strully,* 35 *N.J.* 434, 438 (1961). A statute of limitations achieves those purposes by barring a cause of action after the statutory period. In certain instances, this Court has ruled that the literal language of a statute of limitations should yield to other considerations. *Compare, e. g., Velmohos v. Maren Engineering Corp.,* 83 *N.J.* 282, 293 (1980) *with Galligan v. Westfield Centre Service, Inc.,* 82 *N.J.* 188, 192–193 (1980).

■ To avoid harsh results from the mechanical application of the statute, the courts have developed a concept known as the discovery rule. *Lopez v. Swyer,* 62 *N.J.* 267, 273–275 (1973); *Prosser, The Law of Torts* (4 ed. 1971), § 30 at 144–145; 51 *Am.Jur.*2d, *Limitation of Actions,* § 146 at 716. The discovery rule provides that, in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action. *Burd v. New Jersey Telephone Company,* 76 *N.J.* 284, 291–292 (1978). The rule is essentially a principle of equity, the purpose of which is to mitigate unjust results that otherwise might flow from strict adherence to a rule of law. *Lopez, supra,* 62 *N.J.* at 273–274.

This Court first announced the discovery rule in *Fernandi, supra,* 35 *N.J.* at 434. In *Fernandi,* a wing nut was left in a patient's abdomen following surgery and was not discovered for three years. *Id.* at 450–451. The majority held that fairness and justice mandated that the statute of limitations should not have commenced running until the plaintiff knew or had reason to know of the presence of the foreign object in her body. The discovery rule has since been extended to other areas of medical malpractice. *See, e. g., Lopez, supra* (alleged negligent radiation therapy following a radical mastectomy for breast cancer); *Yerzy v. Levine,* 108 *N.J.Super.* 222 (App.Div.), aff'd per curiam as modified, 57 *N.J.* 234 (1970) (negligent severance by surgeon of bile duct).

Increasing acceptance of the principle of the discovery rule has extended the doctrine to contexts unrelated to medical malpractice. *See, e. g., Diamond v. New Jersey Bell Telephone Co.,* 51 *N.J.* 594, 596–597 (1968) (discovery rule applicable in negligent installation of an underground conduit causing flooding of plaintiff's property); *New Mkt. Poultry Farms, Inc. v. Fellows,* 51 *N.J.* 419, 425 (1968) (discovery rule applicable to negligently prepared survey discovered eleven years after the act); *Brown v. College of Medicine and Dentistry,* 167 *N.J.Super.* 532, 536–537 (Law Div.1979) (dicta would permit action for lost wages pursuant to breach of union's duty to represent fairly bargaining unit even though action instituted beyond period of limitations); *McCoy Co., Inc. v. S.S. "Theomitor III",* 133 *N.J. Super.* 308 (Law Div.1975) (discovery rule permits untimely amendment of complaint to include subsidiary corporations where parent company had been sued within limitations' period); *Gibbins v. Kosuga,* 121 *N.J.Super.* 252 (Law Div.1972) (cause of action allowed under *N.J.S.A.* 2A:14–1 when plaintiffs discovered nine years after closing that well was not located on their property). *See also Rosenau v. City of New Brunswick,* 51 *N.J.* 130, 139–140 (1968) (discovery rule discussed as applying to cause of action under *N.J.S.A.* 2A:14–1 for damage to plaintiff's home fourteen years after installation of defective water meter).

The statute of limitations before us, *N.J.S.A.* 2A:14–1, has been held subject to the discovery rule in an action for wrongful detention of shares of stock. *Federal Insurance Co. v. Hausler,* 108 *N.J.Super.* 421, 426 (App.Div.1970). In *Hausler,* the defendant purchased preferred stock of a corporation through a stockbroker. On March 9, 1961, the broker erroneously sent to the customer a certificate for common stock of greater value. The broker discovered the error in December, 1961, but did not learn the identity of the customer's account in which the error was made until November, 1962. Defendants refused to exchange the common stock for the preferred stock. Plaintiff, a bonding company subrogated to the broker's rights, instituted an action on July 2, 1968, within six years of the date on which the broker learned the identity of the defendants as the customers who

wrongfully received the common stock, but more than six years after the broker knew it had a cause of action. Judge Goldmann, writing for a unanimous court, reversed the grant of a summary judgment for defendants and remanded the matter for a full trial to determine whether (1) the broker knew or reasonably should have known of the error and the defendants' identity in December, 1961 and (2) defendants knew of the mistake from the beginning and fraudulently concealed it. Overruling the trial court which had concluded "[t]his is not a good case in which to apply the discovery rule", Judge Goldmann found the discovery rule applicable. *Id.* at 424, 426.

■ Similarly, we conclude that the discovery rule applies to an action for replevin of a painting under *N.J.S.A.* 2A:14–1. O'Keeffe's cause of action accrued when she first knew, or reasonably should have known through the exercise of due diligence, of the cause of action, including the identity of the possessor of the paintings. *See* N. Ward, *Adverse Possession of Loaned or Stolen Objects—Is Possession Still ⁹⁄₁₀ths of the Law?,* published in *Legal Problems of Museum Administration* (ALI–ABA 1980) at 89–90.

■ We leave to the discretion of the trial judge whether to conduct a preliminary hearing to determine whether O'Keeffe is entitled to the benefit of the discovery rule. Ordinarily that determination would be made in a preliminary hearing out of the presence of the jury. *Lopez, supra,* 62 *N.J.* at 275. But if much of the evidence adduced at the hearing will be the same as that adduced at trial, the judge may elect to receive the evidence in the course of the trial and decide the limitations question at the end of the plaintiff's case or at the conclusion of all evidence. If that procedure is adopted, the trial judge should exclude the jury when the anticipated evidence relates only to the limitations issue, as receipt of that evidence in the presence of the jury might prejudice another party. *Id.* at 275 n. 3.

■ In determining whether O'Keeffe is entitled to the benefit of the discovery rule, the trial court should consider, among others, the following issues: (1) whether O'Keeffe used

due diligence to recover the paintings at the time of the alleged theft and thereafter; (2) whether at the time of the alleged theft there was an effective method, other than talking to her colleagues, for O'Keeffe to alert the art world; and (3) whether registering paintings with the Art Dealers Association of America, Inc. or any other organization would put a reasonably prudent purchaser of art on constructive notice that someone other than the possessor was the true owner.

## V

The acquisition of title to real and personal property by adverse possession is based on the expiration of a statute of limitations. R. Brown, *The Law of Personal Property* (3d ed. 1975), § 4.1 at 33 (Brown). Adverse possession does not create title by prescription apart from the statute of limitations. Walsh, *Title by Adverse Possession*, 17 *N.Y.U.L.Q.Rev.* 44, 82 (1939) (Walsh); *see Developments in the Law—Statutes of Limitations*, 63 *Harv.L.Rev.* 1177 (1950) (*Developments*).

To establish title by adverse possession to chattels, the rule of law has been that the possession must be hostile, actual, visible, exclusive, and continuous. *Redmond v. New Jersey Historical Society*, 132 *N.J.Eq.* 464, 474 (E. & A.1942); 54 *C.J.S. Limitations of Actions* § 119 at 23. *Redmond* involved a portrait of Captain James Lawrence by Gilbert Stuart, which was bequeathed by its owner to her son with a provision that if he should die leaving no descendants, it should go to the New Jersey Historical Society. The owner died in 1887, when her son was 14, and her executors delivered the painting to the Historical Society. The painting remained in the possession of the Historical Society for over 50 years, until 1938, when the son died and his children, the legatees under his will, demanded its return. The Historical Society refused, and the legatees instituted a replevin action.

The Historical Society argued that the applicable statute of limitations, the predecessor of *N.J.S.A.* 2A:14–1, had run and that plaintiffs' action was barred. The Court of Errors and Appeals held that the doctrine of adverse possession applied to

chattels as well as to real property, *Redmond, supra,* 132 *N.J.Eq.* at 473, and that the statute of limitations would not begin to run against the true owner until possession became adverse. *Id.* at 475. The Court found that the Historical Society had done nothing inconsistent with the theory that the painting was a "voluntary bailment or gratuitous loan" and had "utterly failed to prove that its possession of the portrait was 'adversary', 'hostile'." *Id.* at 474–475. The Court found further that the Historical Society had not asserted ownership until 1938, when it refused to deliver the painting to plaintiff, and that the statute did not begin to run until that date. Consequently, the Court ordered the painting to be returned to plaintiffs.

The only other New Jersey case applying adverse possession to chattels is *Joseph v. Lesnevich,* 56 *N.J.Super.* 340 (App.Div. 1949). In *Lesnevich,* several negotiable bearer bonds were stolen from plaintiff in 1951. In October, 1951, Lesnevich received an envelope containing the bonds. On October 21, 1951, Lesnevich and his business partner pledged the bonds with a credit company. They failed to pay the loan secured by the bonds and requested the credit company to sell the bonds to pay the loan. On August 1, 1952, the president of the credit company purchased the bonds and sold them to his son. In 1958, within one day of the expiration of six years from the date of the purchase, the owner of the bonds sued the credit company and its president, among others, for conversion of the bonds. The Appellate Division found that the credit company and its president held the bonds "as openly and notoriously as the nature of the property would permit". *Lesnevich, supra,* 56 *N.J.Super.* at 355. The pledge of the bonds with the credit company was considered to be open possession.

As *Lesnevich* demonstrates, there is an inherent problem with many kinds of personal property that will raise questions whether their possession has been open, visible, and notorious. In *Lesnevich,* the court strained to conclude that in holding bonds as collateral, a credit company satisfied the requirement of open, visible, and notorious possession.

Other problems with the requirement of visible, open, and notorious possession readily come to mind. For example, if jewelry is stolen from a municipality in one county in New Jersey, it is unlikely that the owner would learn that someone is openly wearing that jewelry in another county or even in the same municipality. Open and visible possession of personal property, such as jewelry, may not be sufficient to put the original owner on actual or constructive notice of the identity of the possessor.

The problem is even more acute with works of art. Like many kinds of personal property, works of art are readily moved and easily concealed. O'Keeffe argues that nothing short of public display should be sufficient to alert the true owner and start the statute running. Although there is merit in that contention from the perspective of the original owner, the effect is to impose a heavy burden on the purchasers of paintings who wish to enjoy the paintings in the privacy of their homes.

In the present case, the trial court and Appellate Division concluded that the paintings, which allegedly had been kept in the private residences of the Frank family, had not been held visibly, openly, and notoriously. Notwithstanding that conclusion, the trial court ruled that the statute of limitations began to run at the time of the theft and had expired before the commencement of suit. The Appellate Division determined it was bound by the rules in *Redmond* and reversed the trial court on the theory that the defenses of adverse possession and expiration of the statute of limitations were identical. Nonetheless, for different reasons, the majority and dissenting judges in the Appellate Division acknowledged deficiencies in identifying the statute of limitations with adverse possession. The majority stated that, as a practical matter, requiring compliance with adverse possession would preclude barring stale claims and acquiring title to personal property. *O'Keeffe, supra,* 170 *N.J. Super.* at 86. The dissenting judge feared that identifying the statutes of limitations with adverse possession would lead to a "handbook for larceny". *Id.* at 96. The divergent conclusions of the lower courts suggest that the doctrine of adverse possession

no longer provides a fair and reasonable means of resolving this kind of dispute.

The problem is serious. According to an affidavit submitted in this matter by the president of the International Foundation for Art Research, there has been an "explosion in art thefts" and there is a "worldwide phenomenon of art theft which has reached epidemic proportions".

The limited record before us provides a brief glimpse into the arcane world of sales of art, where paintings worth vast sums of money sometimes are bought without inquiry about their provenance. There does not appear to be a reasonably available method for an owner of art to record the ownership or theft of paintings. Similarly, there are no reasonable means readily available to a purchaser to ascertain the provenance of a painting. It may be time for the art world to establish a means by which a good faith purchaser may reasonably obtain the provenance of a painting. An efficient registry of original works of art might better serve the interests of artists, owners of art, and bona fide purchasers than the law of adverse possession with all of its uncertainties. L. DuBoff, *The Deskbook of Art Law* at 470–472 (Fed.Pub.Inc.1977). Although we cannot mandate the initiation of a registration system, we can develop a rule for the commencement and running of the statute of limitations that is more responsive to the needs of the art world than the doctrine of adverse possession.

We are persuaded that the introduction of equitable considerations through the discovery rule provides a more satisfactory response than the doctrine of adverse possession. The discovery rule shifts the emphasis from the conduct of the possessor to the conduct of the owner. The focus of the inquiry will no longer be whether the possessor has met the tests of adverse possession, but whether the owner has acted with due diligence in pursuing his or her personal property.

For example, under the discovery rule, if an artist diligently seeks the recovery of a lost or stolen painting, but cannot find it or discover the identity of the possessor, the statute of limita-

tions will not begin to run. The rule permits an artist who uses reasonable efforts to report, investigate, and recover a painting to preserve the rights of title and possession.

Properly interpreted, the discovery rule becomes a vehicle for transporting equitable considerations into the statute of limitations for replevin, *N.J.S.A.* 2A:14-1. In determining whether the discovery rule should apply, a court should identify, evaluate, and weigh the equitable claims of all parties. *Lopez, supra,* 62 *N.J.* at 274. If a chattel is concealed from the true owner, fairness compels tolling the statute during the period of concealment. *See Lopez, supra,* 62 *N.J.* at 275 n. 2; *Developments, supra,* 1220 (1950). That conclusion is consistent with tolling the statute of limitations in a medical malpractice action where the physician is guilty of fraudulent concealment. *See Tortorello v. Reinfeld,* 6 *N.J.* 58, 67 (1950); *Bauer v. Bowen,* 63 *N.J.Super.* 225 (App.Div.1960).

It is consistent also with the law of replevin as it has developed apart from the discovery rule. In an action for replevin, the period of limitations ordinarily will run against the owner of lost or stolen property from the time of the wrongful taking, absent fraud or concealment. Where the chattel is fraudulently concealed, the general rule is that the statute is tolled. 51 *Am.Jur.*2d, *Limitation of Actions,* § 124 at 693; 54 *C.J.S. Limitations of Actions,* § 119 at 23; Annotation, "When statute of limitations commences to run against action to recover, or for conversion of, property stolen or otherwise wrongfully taken," 136 *A.L.R.* 658, 661–665 (1942); *see* Dawson, *Fraudulent Concealment and Statutes of Limitation,* 31 *Mich.L.Rev.* 875 (1933); Annotation, "What constitutes concealment which will prevent running of statutes of limitations," 173 *A.L.R.* 576 (1948); Annotation, "When statute of limitations begins to run against action for conversion of property by theft," 79 *A.L.R.*3d 847, § 3 at 853 (1975); *see also* Dawson, *Estoppel and Statutes of Limitation,* 34 *Mich.L.Rev.* 1, 23–24 (1935).

 A purchaser from a private party would be well-advised to inquire whether a work of art has been reported as lost or

stolen. However, a bona fide purchaser who purchases in the ordinary course of business a painting entrusted to an art dealer should be able to acquire good title against the true owner. Under the U.C.C. entrusting possession of goods to a merchant who deals in that kind of goods gives the merchant the power to transfer all the rights of the entruster to a buyer in the ordinary course of business. *N.J.S.A.* 12A:2–403(2). In a transaction under that statute, a merchant may vest good title in the buyer as against the original owner. *See Anderson, supra,* § 2–403:17 *et seq.* The interplay between the statute of limitations as modified by the discovery rule and the U.C.C. should encourage good faith purchases from legitimate art dealers and discourage trafficking in stolen art without frustrating an artist's ability to recover stolen art works.

The discovery rule will fulfill the purposes of a statute of limitations and accord greater protection to the innocent owner of personal property whose goods are lost or stolen. Accordingly, we overrule *Redmond v. New Jersey Historical Society, supra,* and *Joseph v. Lesnevich, supra,* to the extent that they hold that the doctrine of adverse possession applies to chattels.

By diligently pursuing their goods, owners may prevent the statute of limitations from running. The meaning of due diligence will vary with the facts of each case, including the nature and value of the personal property. For example, with respect to jewelry of moderate value, it may be sufficient if the owner reports the theft to the police. With respect to art work of greater value, it may be reasonable to expect an owner to do more. In practice, our ruling should contribute to more careful practices concerning the purchase of art.

The considerations are different with real estate, and there is no reason to disturb the application of the doctrine of adverse possession to real estate. Real estate is fixed and cannot be moved or concealed. The owner of real property knows or should know where his property is located and reasonably can be expected to be aware of open, notorious, visible, hostile, continuous acts of possession on it.

Our ruling not only changes the requirements for acquiring title to personal property after an alleged unlawful taking, but also shifts the burden of proof at trial. Under the doctrine of adverse possession, the burden is on the possessor to prove the elements of adverse possession. *Wilomay Holding Co. v. Peninsula Land Co.*, 36 *N.J.Super.* 440, 443 (App.Div.1955), certif. den. 19 *N.J.* 618 (1955). Under the discovery rule, the burden is on the owner as the one seeking the benefit of the rule to establish facts that would justify deferring the beginning of the period of limitations. *See Lopez, supra,* 62 *N.J.* at 276.

## VI

Read literally, the effect of the expiration of the statute of limitations under *N.J.S.A.* 2A:14–1 is to bar an action such as replevin. The statute does not speak of divesting the original owner of title. By its terms the statute cuts off the remedy, but not the right of title. Nonetheless, the effect of the expiration of the statute of limitations, albeit on the theory of adverse possession, has been not only to bar an action for possession, but also to vest title in the possessor. There is no reason to change that result although the discovery rule has replaced adverse possession. History, reason, and common sense support the conclusion that the expiration of the statute of limitations bars the remedy to recover possession and also vests title in the possessor.

Professor Brown explains the historical reason for construing the statute of limitations as barring the right of title as well as an action for possession:

> The metamorphosis of statutes simply limiting the time in which an action may be commenced into instrumentalities for the transfer of title may be explained perhaps by the historical doctrine of disseisin which, though more customarily applied to land, was probably originally controlling as to chattels also. By this doctrine the wrongful possessor as long as his possession continued, was treated as the owner and the dispossessed occupant considered merely to have a personal right to recapture his property if he could. [Brown, *supra,* § 4.1 at 34]

*See* 3 *Am.Jur.2d, Adverse Possession,* § 202 at 290–292; 3 *American Law of Property,* § 15.16 at 834.

Before the expiration of the statute, the possessor has both the chattel and the right to keep it except as against the true owner. The only imperfection in the possessor's right to retain the chattel is the original owner's right to repossess it. Once that imperfection is removed, the possessor should have good title for all purposes. Ames, *The Disseisin of Chattels*, 3 *Harv. L.Rev.* 313, 321 (1890) (Ames). As Dean Ames wrote: "An immortal right to bring an eternally prohibited action is a metaphysical subtlety that the present writer cannot pretend to understand." *Id.* at 319.

Recognizing a metaphysical notion of title in the owner would be of little benefit to him or her and would create potential problems for the possessor and third parties. The expiration of the six-year period of *N.J.S.A.* 2A:14-1 should vest title as effectively under the discovery rule as under the doctrine of adverse possession.

Our construction of *N.J.S.A.* 2A:14-1 is consistent with the construction of *N.J.S.A.* 2A:14-6, one of the statutes pertaining to title by adverse possession of real estate. That statute recites that one with right or title of entry into real estate shall make such entry within 20 years after the accrual of the right or be barred. It does not expressly state that the expiration of 20 years vests title in the possessor. Two other statutes pertaining to the adverse possession of real estate, *N.J.S.A.* 2A:14-30 and 31, expressly state that adverse possession for the statutory period shall vest title in the possessor. Notwithstanding the difference in wording between *N.J.S.A.* 2A:14-6 and *N.J.S.A* 2A:14-30 and 31, the former statute has always been construed as vesting title in the adverse possessor at the end of the statutory period. *See, e. g., Braue v. Fleck*, 23 *N.J.* 1, 16 (1956).

To summarize, the operative fact that divests the original owner of title to either personal or real property is the expiration of the period of limitations. In the past, adverse possession has described the nature of the conduct that will vest title of a chattel at the end of the statutory period. Our adoption of the discovery rule does not change the conclusion that at the end of the statutory period title will vest in the possessor.

## VII

We next consider the effect of transfers of a chattel from one possessor to another during the period of limitation under the discovery rule. Under the discovery rule, the statute of limitations on an action for replevin begins to run when the owner knows or reasonably should know of his cause of action and the identity of the possessor of the chattel. Subsequent transfers of the chattel are part of the continuous dispossession of the chattel from the original owner. The important point is not that there has been a substitution of possessors, but that there has been a continuous dispossession of the former owner.

Professor Ballantine explains:

> Where the same claim of title has been consistently asserted for the statutory period by persons in privity with each other, there is the same reason to quiet and establish the title as where one person has held. The same flag has been kept flying for the whole period. It is the same ouster and disseisin. If the statute runs, it quiets a title which has been consistently asserted and exercised as against the true owner, and the possession of the prior holder justly enures to the benefit of the last. [H. Ballantine, *Title by Adverse Possession*, 32 *Harv.L. Rev.* 135, 158 (1919)]

The same principle appears in the *Restatement (Second) of Torts* :

> In some cases, the statute of limitations begins to run before the defendant took possession as when a previous taker converted the chattel and later transferred possession to the defendant. [*Restatement (Second) of Torts* 2d § 899 at 442 (1977)]

For the purpose of evaluating the due diligence of an owner, the dispossession of his chattel is a continuum not susceptible to separation into distinct acts. Nonetheless, subsequent transfers of the chattel may affect the degree of difficulty encountered by a diligent owner seeking to recover his goods. To that extent, subsequent transfers and their potential for frustrating diligence are relevant in applying the discovery rule. An owner who diligently seeks his chattel should be entitled to the benefit of the discovery rule although it may have passed through many hands. Conversely an owner who sleeps on his rights may be denied the benefit of the discovery rule although the chattel may have been possessed by only one person.

■■■ We reject the alternative of treating subsequent transfers of a chattel as separate acts of conversion that would start the statute of limitations running anew. At common law, apart from the statute of limitations, a subsequent transfer of a converted chattel was considered to be a separate act of conversion. In his dissent, Justice Handler seeks to extend the rule so that it would apply even if the period of limitations had expired before the subsequent transfer. Nonetheless, the dissent does not cite any authority that supports the position that the statute of limitations should run anew on an act of conversion already barred by the statute of limitations. Adoption of that alternative would tend to undermine the purpose of the statute in quieting titles and protecting against stale claims. Brown, *supra*, § 4.3 at 38.

The majority and better view is to permit tacking, the accumulation of consecutive periods of possession by parties in privity with each other. *Lesnevich, supra*, 56 *N.J.Super.* at 357; *see also O'Connell v. Chicago Park Dist.*, 376 *Ill.* 550, 34 *N.E.2d* 836 (1941); Brown, *supra*, § 18–39; Walsh, *supra* at 84; Comment, 14 *Rut.L.Rev.* 443, 444–445 (1960).

As explained by Professor Walsh:

The doctrine of tacking applies as in corresponding cases of successive adverse possessions of land where privity exists between such possessors. Uncertainty is created by cases which hold that each successive purchaser is subject to a new cause of action against which the statute begins to run from that time, in this way indefinitely extending the time when the title will be quieted by operation of the statute. It should be entirely clear that the purposes of statutes of limitation are the same whether they relate to land or chattels, and therefore the same reasons exist for tacking successive possessions as the prevailing cases hold. Nevertheless, under the cases, new actions in conversion arise against successive purchases of the converted property, and there is strong reason back of the argument that the statute runs anew against each succeeding cause of action. No doubt the prevailing rule recognizing privity in these cases may be based upon the argument that the possessory title is transferred on each successive sale of the converted chattel, subject to the owner's action to recover the property, and the action of replevin which is his proprietory action, continues in effect against succeeding possessors so that the statute bars the action after the successive possessions amount to the statutory period. [Walsh, *supra* at 83–84]

In New Jersey tacking is firmly embedded in the law of real property. *O'Brien v. Bilow*, 121 *N.J.L.* 576, 578–579 (E. & A.1938). The rule has been applied also to personal property.

*Lesnevich, supra,* 56 *N.J.Super.* at 357. In *Lesnevich,* the pledge of the bonds with the credit company and the subsequent purchase by the company's president were separate acts of conversion. The pledge was beyond the period of the statute of limitations and the purchase was within the period. *Id.* at 353. The Appellate Division permitted tacking of the two periods, with the result that the second act of conversion did not alter the running of the period. *Id.* at 357.

The dissent by our colleague Justice Handler seeks to distinguish *Lesnevich* because it involved negotiable instruments. However, the law of negotiable instruments was irrelevant to the decision since the court held the credit company and its president were not holders in due course. *Lesnevich, supra,* 56 *N.J.Super.* at 352.

Treating subsequent transfers as separate acts of conversion could lead to absurd results. As explained by Dean Ames:

> The decisions in the case of chattels are few. As a matter of principle, it is submitted this rule of tacking is as applicable to chattels as to land. A denial of the right to tack would, furthermore, lead to this result. If a converter were to sell the chattel, five years after its conversion, to one ignorant of the seller's tort, the disposed owner's right to recover the chattel from the purchaser would continue five years longer than his right to recover from the converter would have lasted if there had been no sale. In other words, an innocent purchaser from a wrong-doer would be in a worse position than the wrong-doer himself,—a conclusion as shocking in point of justice as it would be anomalous in law. [Ames, *supra* at 323, footnotes omitted]

It is more sensible to recognize that on expiration of the period of limitations, title passes from the former owner by operation of the statute. Needless uncertainty would result from starting the statute running anew merely because of a subsequent transfer. 3 *American Law of Property,* § 15.16 at 837. It is not necessary to strain equitable principles, as suggested by the dissent, to arrive at a just and reasonable determination of the rights of the parties. The discovery rule permits an equitable accommodation of the rights of the parties without establishing a rule of law fraught with uncertainty.

## VIII

We recognize the possible relevancy of claims of common law and statutory copyright and related questions of in-

fringement. The parties have not raised any copyright issue in the pleadings, on the motion for summary judgment, or on this appeal. On the limited record before us, we cannot evaluate the existence or merit of copyright claims. Depending on the evidence adduced at trial, copyright claims may arise under federal statutes or the common law. For present purposes, it is sufficient to note that there are valuable rights in a work of art, apart from the right to title and possession; such as, the rights of reproduction, distribution, and display. Those rights, assembled under the rubric of a copyright, are not involved in this appeal.

Shortly before and after oral argument, various motions were filed with the Court. A motion by O'Keeffe for acceleration is now moot. Motions to supplement the record by O'Keeffe and Snyder, as well as a petition by the Art Dealers Association of America to file a brief *amicus curiae*, raise essentially factual matters. Because we remand this matter for trial, those motions also are rendered moot.

O'Keeffe is a distinguished American artist, now 92 years old and living in New Mexico. In this proceeding, she has been deposed in her attorney's office in New York City. At oral argument, we were informed that she had visited New York recently for reasons unrelated to the litigation. Nonetheless, if, because of her age, O'Keeffe is unable to travel to New Jersey for trial, an appropriate application may be made to the trial court to perpetuate her testimony. Furthermore, we direct the trial court to expedite both discovery proceedings and the trial.

We reverse the judgment of the Appellate Division in favor of O'Keeffe and remand the matter for trial in accordance with this opinion.

SULLIVAN, J., dissenting.

I do not see the need for a remand. We have plaintiff Georgia O'Keeffe's affidavit and deposition concerning the paintings, defendant Barry Snyder's affidavit as to the circumstances under which he acquired possession of them and the deposition

of third party defendant Ulrich A. Frank. Apparently, the parties felt that there was nothing further needed, as cross-motions for summary judgment were made.

Plaintiff is a famous artist and the creator of the three paintings in suit. These paintings were in her possession located in an art studio run by her husband Alfred Stieglitz. In 1946 she and her husband noticed that one of the paintings, then on display, was missing from the wall on which it was hung. Plaintiff recalled that she and Stieglitz talked about "the picture being gone" although she did not remember exactly what was said. Plaintiff also testified that Stieglitz spoke "a good deal" about the missing picture to everyone who came into the studio.

Shortly thereafter plaintiff discovered that two other paintings of hers, not on display, were also missing. She did not notify the police as she was certain that they could not or would not do anything as the paintings had small monetary value at the time, but she and Stieglitz did speak to friends and acquaintances in art circles about the theft. She said that since "the word was out" in art circles in New York about the stolen paintings she and her husband hoped that some clue as to the identity of the thief would be known. She felt that all she could do was wait and see if some information would come concerning the paintings' whereabouts. In 1972, shortly after the Art Dealers Association of America, Inc. (Association) came into existence and established a registry of stolen paintings, the loss of the three paintings was reported to the Association which listed them as stolen on its registry.

In late 1975, plaintiff learned that the paintings were on consignment to an art gallery in New York and in February 1976 she discovered that they were in the possession of defendant Barry Snyder, a Princeton art dealer. She immediately demanded their return and, following refusal, instituted the present suit.

Snyder had purchased the pictures from Ulrich A. Frank, the third party defendant, in March 1975. In his affidavit filed in

the cause, Snyder, although a professional art dealer, stated that he was unaware of the registry of stolen paintings maintained by the Association which showed the paintings as stolen at the time he purchased them. Although he paid $35,000 for them, Snyder made no attempt to authenticate the paintings or verify ownership—this in spite of the fact that Frank, who had acquired possession of them by gift from Dr. Frank, his late father, did not know how his father had come by the paintings.

Now that his motion for summary judgment has been lost, defendant Snyder suggests speculative possibilities that he says merit inquiry even though there is nothing in the record to support them. I see no substance in any of them, and a remand as prejudicial to plaintiff who is now more than 92 years of age.

She created these paintings. They were in her possession when they disappeared from her husband's art gallery in 1946. She did not learn of their whereabouts until late 1975 when they were offered for sale. She immediately started suit to recover them as soon as she was able to identify the person who had possession of them. Under these circumstances the six-year statute of limitations for bringing an action in replevin, *N.J.S.A.* 2A:14–1, was tolled and plaintiff, as the rightful owner, is entitled to a judgment in her favor.

I have no quarrel with most of the legal principles set forth in the majority opinion. We part company in the manner in which they have been applied to the undisputed facts of this case. I would affirm the Appellate Division ruling in its entirety.

HANDLER, J., dissenting.

The Court today rules that if a work of art has been stolen from an artist, the artist's right to recover his or her work from a subsequent possessor would be barred by the statute of limitations if the action were not brought within six years after the original theft. This can happen even though the artist may have been totally innocent and wholly ignorant of the identity of the thief or of any intervening receivers or possessors of the stolen art. The Court would grudgingly grant some measure of

relief from this horrendous result and allow the artist to bring suit provided he or she can sustain the burden of proving "due diligence" in earlier attempting to retrieve the stolen artwork. No similar duty of diligence or vigilance, however, is placed upon the subsequent receiver or possessor, who, innocently or not, has actually trafficked in the stolen art. Despite ritualistic disavowals, the Court's holding does little to discourage art thievery. Rather, by making it relatively more easy for the receiver or possessor of an artwork with a "checkered background" to gain security and title than for the artist or true owner to reacquire it, it seems as though the Court surely will stimulate and legitimatize art thievery.

I believe that there is a much sounder approach in this sort of case than one that requires the parties to become enmeshed in duplicate or cumulative hearings that focus on the essentially collateral issues of the statute of limitations and its possible tolling by an extended application of the discovery doctrine. The better approach, I would suggest, is one that enables the parties to get to the merits of the controversy. It would recognize an artist's or owner's right to assert a claim against a newly-revealed receiver or possessor of stolen art as well as the correlative right of such a possessor to assert all equitable and legal defenses. This would enable the parties to concentrate directly upon entitlement to the artwork rather than entitlement to bring a lawsuit. By dealing with the merits of the claims instead of the right to sue, such an approach would be more conducive to reconciling the demands for individual justice with societal needs to discourage art thievery. In addition, such a rule would comport more closely with traditional common law values emphasizing the paramountcy of the rights of a true owner of chattels as against others whose possession is derived from theft. Simultaneously, it would acknowledge that the claims of the true owner as against subsequent converters may in appropriate circumstances be counterbalanced by equitable considerations.

I therefore dissent.

I

By virtue of cross-motions for summary judgment, the posture of the case as it comes to us is that the paintings were stolen from their true owner, plaintiff O'Keeffe, and that defendant Snyder acted in good faith in purchasing the paintings. Hence, we are presented for purposes of this appeal with the classic confrontation between a true owner of property and a subsequent bona fide purchaser for value, each of whom is relatively innocent and each of whom has been victimized by a thief. The true owner here is the artist who created the paintings, and she seeks to recover them through an action for replevin.

An action brought for replevin is a proper means for an owner to regain possession of chattels lost through conversion. *Baron v. Peoples National Bank of Secaucus*, 9 *N.J.* 249, 255–256 (1952); D. Dobbs, *The Law of Remedies* § 5.13 at 399 *et seq.* (1973); 20 *N.J. Practice* (Ackerson & Fulop, *Skills and Methods*) § 1711 at 490 (2 ed. 1973); 66 *Am.Jur.2d, Replevin,* § 39 at 860 (1973); see also *Plummer v. Kingsley,* 190 *Or.* 378, 384–385, 226 *P.2d* 297, 300–301 (Sup.Ct.1951); J. Darlington, *The Law of Personal Property* 4 (1891). The statute of limitations applicable to replevin actions is six years. *N.J.S.A.* 2A:14–1. A fundamental miscalculation by the majority, however, is its assumption that this six-year limitations statute is applicable to O'Keeffe's claims. The statute of limitations defense was raised by defendant Snyder, but it is not available here because Snyder's acts of conversion—his purchase of the paintings from third-party defendant Frank and his refusal to return them to plaintiff O'Keeffe upon demand—constituted independent tortious acts each of which occurred well within six years of the commencement of plaintiff's lawsuit. Hence, there is no reason not to permit O'Keeffe's lawsuit and allow the parties to proceed to the heart of the controversy.[1]

---

[1] It is understandable that both lower courts in addressing the merits of the controversy dealt with the defenses of the statute of limitations and adverse possession since those courts were bound by *Redmond v. New Jersey Histori-*

In averting a direct confrontation with the merits of the dispute, the majority ignores some rather fundamental law. It rejects the doctrine that the acquisition of a stolen chattel, or a refusal to return it upon demand, itself constitutes a tortious conversion as against the true owner. *Ante* at 489–490. It has not come to this position easily. The majority opinion recognizes the New York rule which clearly and dispositively treats a subsequent possessor's refusal to return goods upon a demand from the owner as an act of conversion that triggers the running of the statute of limitations applicable to replevin actions. *Ante* at 502–504. See *Menzel v. List*, 49 *Misc.*2d 300, 304–305, 267 *N.Y.S.*2d 804, 809 (Sup.Ct.1966), aff'd as modified 28 *A.D.*2d 516, 279 *N.Y.S.*2d 608 (App.Div.1967), rev'd in part on other grounds, 24 *N.Y.*2d 91, 246 *N.E.*2d 742, 298 *N.Y.S.* 2d 979 (Ct.App.1969). But the Court, relying upon *Heavner v. Uniroyal, Inc.*, 63 *N.J.* 130, 140–141 (1973), declines to follow the New York law on the theory that the New York law is a statute of limitations and that the New Jersey statute of limitations, rather than that of New York, should be applied. The issue, however, is not whether the New Jersey statute of limitations should be followed rather than that of New York. The New York rule of subsequent conversions, rejected by the majority, is not a "statute of limitations," but rather is a *substantive* principle of the law of torts. The majority simply sidesteps the question of which state's *tort* law ought to be applied to this case.

<hr />

*cal Society*, 132 *N.J.Eq.* 464 (E. & A. 1942), and at least constrained by *Joseph v. Lesnevich*, 56 *N.J.Super.* 340 (App.Div.1959). This Court, however, is not required to follow either decision; it is, therefore, less explicable as to why the Court has permitted itself to become entangled in these abstruse doctrines as applied to stolen or lost works of art. At any rate, I do not believe that *Lesnevich* is a persuasive decision as to the necessity for "tacking" in the application of the statute of limitations to chattels. *Post* at 511. Also I agree with the dissenting view below of Judge Fritz, 170 *N.J.Super.* at 93, 95 that the doctrine of adverse possession should not be applied to personalty and, to that extent, I join the Court in overruling *Redmond*, which had found the doctrine to be applicable to conflicting ownership claims to a painting (132 *N.J.Eq.* at 473). *Ante* at 498–499.

Nevertheless, in the context of this case, that misstep should not be significant since it does not appear that New York law with respect to actionable conversion is truly at variance with the law of this jurisdiction. See, *e. g., Joseph v. Lesnevich*, 56 *N.J.Super.* 340, 346 (App.Div.1959). It is clearly the predominant view that subsequent transfers of a stolen chattel constitute separate acts of conversion. R. Bowers, *The Law of Conversion* § 40 at 31 (1917); R. Brown, *The Law of Personal Property* § 6.6 at 58 (3 ed. 1975); F. V. Harper and F. James, Jr., *The Law of Torts* § 2.35 at 188–189 (1956); W. Prosser, *The Law of Torts* § 15 at 84 (4 ed. 1971); *Restatement (Second) of Torts* § 229, Comments e and g (1965); Annot., "When Statute of Limitations Begins to Run against Action for Conversion of Property by Theft," 79 *A.L.R.*3d 847, § 4 at 855 (1975). Indeed, in authority used today in the majority opinion (*ante* at 492–493), it does not appear to be questioned even by institutions clothed with probity—*e. g.*, art museums—that an acquisition of stolen art constitutes a separate conversionary act which starts the statute of limitations running either initially or "anew." Ward, "Adverse Possession of Loaned and Stolen Objects: Is Possession Still 9/10ths of the Law?," in *Legal Problems of Museum Administration* 83, 96–97 (ALI–ABA 1980) (as to acquisition of stolen art, "the principle would be that the statute of limitations would start to run on the date of our [, *i. e.*, the museum's,] innocent acquisition").

The Court seems to harbor the view that a subsequent transfer of stolen property does not, in effect, constitute a separate conversionary act. As a tortious act, a subsequent conversion known to the injured owner of the goods would constitute the accrual of a cause of action and would trigger the running of the statute of limitations. Nevertheless, according to the Court, a second or subsequent act of conversion does not constitute a separate cause of action because it does not start the "statute of limitations running anew," this position being allegedly consistent with "[t]he majority and better view [which] permit[s] tacking." *Ante* at 503. The majority's reliance here on *Joseph v. Lesnevich, supra*, for this proposition is unconvincing.

While the court in that case did allow a "tacking" of wrongful possession, it did so only with regard to negotiable instruments, a long-established exception to the general rule. 56 *N.J.Super.* at 346, 357. See *Shaw v. R. R. Co.*, 101 *U.S.* 557, 564, 25 *L.Ed.* 892, 894 (1880); Bowers, *supra*, § 41 at 31–32; Darlington, *supra* at 357; Dobbs, *supra*, § 4.7 at 286–288; Prosser, *supra*, § 15 at 84–85.

The Court further observes in this case that a cause of action for conversion accrued with the original theft of the paintings in 1946; it assumes that the statute of limitations commenced to run from the date of that theft, at least absent any tolling of the limitations period by the application of the discovery rule. The reasoning then jumps. According to the Court, unless there were "tacking," *i. e.*, a refusal to allow or require the statute of limitations to run "anew" from the occurrence of the second and separate act of conversion, we would in effect be allowing a stale claim. Since "stale claims" are to be discouraged through statutes of limitations, "tacking" must be invoked to bar the old claim. *Ante* at 503. In this elliptical fashion, the majority effectively obliterates the tortious character of a subsequent conversion. *Ante* at 504.

There are several weaknesses in the Court's position. The most fundamental is the contention that O'Keeffe's claim against Snyder is "stale." Another is the assumption that the policies of repose and the like can be fulfilled in this case only by eliminating a legitimate cause of action, namely, that based on a subsequent conversion. Still another is the majority's view, derived from an affidavit, that stability of possession and title is as important in the world of art as it is in the field of commercial sales and, indeed, is so important that it requires a rule that will, more often than not, settle title to stolen art in the hands of an ultimate possessor whether he or she be truly innocent, simply lucky, just plain cunning, or actually larcenous. *Ante* at 503. No persuasive reasons are advanced for the view that this notion of "stability," which would serve in many cases actually to legitimatize art theft, is more important than is the return of stolen unique, artistic creations to their creator or true owner when this is justified by equitable considerations.

## II

The holding of the majority, which involves a convoluted rendition of the law of statutes of limitations and adverse possession, in my respectful opinion, not only espouses an erroneous perception of the proper public policy to be achieved, but is actually unneeded even to secure the values endorsed by the Court. There is no reason why the concerns of the majority cannot be reasonably and fully accommodated by traditional doctrines that would, in a case such as this, lead us to a thorough consideration and careful balancing of all the equities as they bear directly upon the merits of the controversy.

It is the general rule that "a bona fide purchaser of personal property taken tortiously or wrongfully, as by trespass or theft, does not acquire a title good against the true owner." *Kutner Buick, Inc. v. Strelecki,* 111 *N.J.Super.* 89, 97 (Ch.Div.1970) (purchaser of stolen motor vehicle); accord, *Joseph v. Lesnevich, supra,* 56 *N.J.Super.* at 346; see *Ashton v. Allen,* 70 *N.J.L.* 117, 119 (Sup.Ct.1903); Bowers, *supra,* § 40 at 30–31; Darlington, *supra* at 359. This principle is recognized by the majority, *ante* at 488–489 and was embraced both by the Appellate Division majority, *O'Keeffe v. Snyder,* 170 *N.J.Super.* 75, 82 (App.Div. 1979), and in the dissent of Judge Fritz, *id.* at 93.

This rule is not a recent development. As noted by Judge Fritz in his dissenting opinion below, *id.* at 94, it has a long and distinguished history and was recognized by Lord Blackstone as a fundamental principle of English law with respect to chattels or personal property. 2 W. Blackstone, *Commentaries* *449; 3 *Blackstone, supra* at *145. This basic rule as to nonpassage of title to stolen personalty, *viz,* "[i]f a person steal [*sic*] goods and sell [*sic*] them, the title is not transferred, but remains in the original owner, and he may reclaim them," was adopted in this country. J. Elliott, *New Jersey Law of Sales* 369 n.14 (1909); see Bowers, *supra,* § 40 at 31. Early cases in the United States followed this rule that good title could not be acquired from a thief, even by a bona fide purchaser. *E. g., Shaw v. R. R. Co., supra,* 101 *U.S.* at 564–565, 25 *L.Ed.* at 894; *Heckle v. Lurvey,* 101 *Mass.* 344, 345 (Sup.Jud.Ct.1869) ("[t]he principle is well

settled, that, when a thief sells chattels, even to an honest purchaser, no title passes"); *Dame v. Baldwin,* 8 *Mass.* 518, 521 (1812); *Williams v. Merle,* 11 *Wend.* 80, 81–82 (N.Y.Sup.Ct. 1831); *Mowrey v. Walsh,* 8 *Cowen* 238, 241 (N.Y.Sup.Ct.1826).

This legal axiom was not altered by the codification and adoption of the Uniform Commercial Code (hereinafter Code or U.C.C.), which has been described as "deriv[ing] from the common law" and as "assum[ing] the continuing existence of a large body of pre-Code and non-Code law on which it rests for support, which it displaces to the least possible extent, and without which it could not survive." Gilmore, "Article 9: What it Does for the Past," 26 *La.L.Rev.* 285, 285–286 (1966). See J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 2 at 6 (1972). On the topic of acquisition of title to chattels from a wrongdoer, the Code states that "[a] purchaser of goods acquires all title which his transferor had or had power to transfer . . . ." *N.J.S.A.* 12A:2–403(1) (*U.C.C.* § 2–403(1)). Therefore, if the wrongdoer has no title, he or she cannot convey title; the purchaser acquires only that title reposing in the transferor. As noted in the New Jersey Study Comments to the U.C.C. as enacted, "[n]othing in this portion of the subsection [*N.J.S.A.* 12A:2–403(1)] would change the law that a purchaser from a thief gains no interest in the goods." Study Comment 2 to *N.J.S.A.* 12A:2–403(1). See *Lieber v. Mohawk Arms, Inc.,* 64 *Misc.*2d 206, 208, 314 *N.Y.S.*2d 510, 512 (Sup.Ct.1970) (plaintiff entitled under U.C.C. to recover possession from bona fide purchaser certain of Adolf Hitler's personal effects to which plaintiff had title and which had been stolen from plaintiff); 67 *Am.Jur.*2d, *Sales,* § 257 at 392 (1973).

It follows from this well-established principle that, generally, as between the true owner who has lost personal property through theft and a subsequent good faith purchaser for value, the former is entitled to the goods over the latter. Title remains in the true owner rather than flowing to the bona fide purchaser when " 'the wrongdoer sells the chattel to [such] innocent purchaser . . . because the wrongdoer had [no title] to give.' " *Kutner Buick, Inc. v. Strelecki, supra,* 111

*N.J.Super.* at 97 (quoting from *National Retailers Mut. Ins. Co. v. Gambino*, 1 *N.J.Super.* 627, 629 (Law Div.1948)). Accord, *Joseph v. Lesnevich, supra*, 56 *N.J.Super.* at 346; see, *e. g., Barry Industries, Inc. v. Aetna Casualty & Surety Co.*, 302 A.2d 61, 63 (D.C.1973) ("The law is well settled that a possessor of stolen goods can never convey good title.") (sale of stolen automobile); *Jordan v. Kancel*, 188 *Kan.* 292, 294, 361 *P.2d* 894, 896 (Sup.Ct.1961) (replevin action to recover television sets sold without title or authority by rental agent; "[i]t is a general rule with regard to personal property that title, like a stream, cannot rise higher than its source" (citation omitted)); *Linwood Harvestore, Inc. v. Cannon*, 427 *Pa.* 434, 437, 235 *A.2d* 377, 380 (Sup.Ct.1967) (good faith purchase of farm equipment from converter; "[t]he general rule for chattels is that a bona fide purchaser from a thief gets nothing"); Prosser, *supra* § 15 at 87; *Restatement (Second) of Torts, supra,* § 229, Comment e at 448.

These basic tenets are fully applicable to creative works of art and govern ownership claims in the case of the theft or wrongful appropriation of artistic creations such as those involved in this case. *E. g., Porter v. Wertz*, 68 *A.D.2d* 141, 149, 416 *N.Y.S.* 2d 254, 259 (App.Div.1979) (true owners of a painting by Maurice Utrillo, entitled *Chateau de Lion-sur-Mer*, could recover either the painting or damages as against defendant gallery which purchased the painting from an individual who had acquired it wrongfully from another person who was not authorized by the owner to sell it); *cf. Lieber v. Mohawk Arms, Inc., supra*, 64 *Misc.2d* at 208, 314 *N.Y.S.2d* at 512 (owner of personal effects of Adolf Hitler entitled to recover these unique items stolen from him by transferor of defendant bona fide purchaser).

Consequently, if we were to view this record as presenting only the undisputed fact that the paintings were stolen and could thus not be validly transferred thereafter to Snyder as a bona fide purchaser, plaintiff O'Keeffe would clearly be entitled to prevail. And, in that posture, I would subscribe to the result urged in the dissenting opinion of Justice Sullivan, *ante* at 506–507, namely, a reversal and entry of judgment in favor of

plaintiff. Under all of the circumstances, however, I do not believe that such a disposition would be appropriate and would instead counsel a remand, albeit with a focus and under guidelines very different from those expressed in the majority opinion.[2]

### III

"As a general rule, a defendant in a replevin action may interpose any defense which questions the plaintiff's title or right to possession, or upholds his own taking or unlawful detention." 66 *Am.Jur.2d, Replevin,* § 47 at 864 (1973) (footnotes omitted). See 20 *N.J. Practice, supra,* § 1739 at 509–510. While the fundamental principle is that a wrongdoer cannot, as against the true owner, convey good title even to a bona fide purchaser, that precept is not absolute. Some exceptions to this common law rule are derived from judicial rulings, others, from statutes. Dobbs, *supra,* § 4.7 at 282, 286; *N.J.S.A.* 12A:2–403(2) (*U.C.C.* § 2–403(2)) (U.C.C. codifies the common law notion of voidable or equitable title where goods have been "entrusted" by the owner "to a merchant who deals in goods of that kind").

Aside from specialized defenses peculiar to sales transactions, there are also general equitable defenses—such as laches, unclean hands, estoppel or mistake—cognizable in equity actions or in other actions in which such defenses may be raised. Dobbs, *supra,* § 2.4 at 45 *et seq.* Notwithstanding in this case a failure to denominate each and every equitable defense which might be

---

[2] I am constrained to agree with the Court that the cross-motions for summary judgment have not satisfactorily eliminated all disputes as to material facts. It seems manifest that the parties brought their respective motions in order to obtain dispositive rulings as to the defenses of the statute of limitations and the doctrine of adverse possession. If defendants were entitled to prevail under either of these defenses, this would have terminated the litigation (the result actually reached by the trial court). Since, in my view, these defenses are not available, rulings in favor of plaintiff would have the effect only of a partial summary judgment under *R.* 4:46–2 because other issues remain unresolved in the case. Such a result would require a remand to decide such remaining issues. See *Rotwein v. General Accident Group,* 103 *N.J.Super.* 406, 424–425 (Law Div.1968).

available to him, defendant Snyder has adequately invoked the defenses which would be germane in addressing plaintiff's claim for the return of the paintings. He has asserted his own ownership of the paintings, implying thereby that, under all of the circumstances surrounding the original disappearance of the paintings, their subsequent possession by others, and his eventual purchase for value, his own entitlement to possession of them exceeds that of O'Keeffe. He has also alleged laches as against plaintiff, undoubtedly intending to establish that she delayed unduly in bringing an action to recover her paintings against those whom she knew or ought to have known were in possession thereof and that, as a result, he ultimately stands to suffer a loss.

Our courts have taken an expansive and flexible approach in the application of equitable defenses. See, e. g., *Journeymen Barbers, Hairdressers & Cosmetologists' Int'l Union v. Pollino,* 22 *N.J.* 389, 401 (1956); see also *Johnson v. Yellow Cab Transit Co.,* 321 *U.S.* 383, 387–388, 64 *S.Ct.* 622, 625, 88 *L.Ed.* 814, 819 (1944). For example, in *Untermann v. Untermann,* 43 *N.J.Super.* 106, 109 (App.Div.1956), certif. den. 23 *N.J.* 363 (1957), while the court stated that the doctrine of unclean hands may bar a cause of action for separate maintenance, it also observed that this defense was an aspect or application of the broader equitable principle that "he who seeks equity must do equity"; hence, the defendant in such an action could under certain circumstances be estopped to raise the defense. The *Untermann* court further noted that the "doctrines of unclean hands and estoppel . . . are somewhat akin. . . . They are flexible in their application, turning largely on the circumstances involved in the . . . 'total situation.' . . . They may turn, too, upon the relative innocence or culpability of the plaintiff and defendant, for the law may aid the one who is comparatively the more innocent." 43 *N.J.Super.* at 109 (citations omitted). We recently recognized this principle in *Kazin v. Kazin,* 81 *N.J.* 85, 94 (1979). *Cf. Union Beach Bd. of Educ. v. New Jersey Educ. Ass'n,* 96 *N.J.Super.* 371, 386–389 (Ch.Div.1967) (doctrine of unclean hands was not available to defendants whose conduct

was in violation of the Constitution and where the imposition of the doctrine would be contrary to public policy), aff'd 53 *N.J.* 29, 43 (1968) (Weintraub, C. J.) ("the doctrine will not be invoked when to do so will injure the public").

Similarly, equitable estoppel has been applied flexibly "as a general principle, used as a means of preventing [one] from taking an inequitable advantage of a predicament in which his own conduct had placed his adversary." Prosser, *supra*, § 105 at 691; see *Kazin v. Kazin, supra*, 81 *N.J.* at 94. Sometimes referred to as estoppel *in pais*, this doctrine "has been defined as 'an impediment or bar, by which a man is precluded from alleging, or denying, a fact, in consequence of his own previous act, allegation or denial to the contrary.'" Prosser, *supra*, § 105 at 691 (footnote omitted).

These estoppel-based equitable defenses have been applied in actions involving conflicting ownership claims to chattels. *E. g., Nelson v. Wolf*, 4 *N.J.* 76, 79–80 (1950) (an "owner may be estopped from setting up his own title and the lack of title in the vendor as against a *bona fide* purchaser for value where the owner has clothed the vendor with possession and other indicia of title"); see *James Talcott, Inc. v. Associates Discount Corp.*, 302 *F.*2d 443, 447 (8 Cir. 1962) (Blackmun, J.) (under Arkansas law estoppel is defense to action to recover for wrongful resale of goods initially transferred to vendor by conditional sale); *Zendman v. Harry Winston, Inc.*, 305 *N.Y.* 180, 184–188, 111 *N.E.*2d 871, 873–875 (Ct.App.1953) (under New Jersey law, estoppel defense invocable by purchaser where owner vested vendor with apparent authority to dispose of or sell the particular chattel); *Hertz Corp. v. Hardy*, 197 *Pa.Super.* 466, 471–476, 178 *A.*2d 833, 836–838 (Super.Ct.1962) (estoppel is an affirmative defense to an action for replevin of rented automobile which has been wrongfully sold to defendants; here, however, defendant bona fide purchaser had not relied on anything that plaintiff did and thus the equitable estoppel defense must fail).

A thorough balancing of the equities has been followed specifically to adjudicate the competing claims for misappropriated works of art. In *Porter v. Wertz, supra*, plaintiffs had loaned a

Utrillo painting to a potential purchaser thereof pending a decision as to whether or not to purchase it; that individual, however, proceeded to sell the painting to a delicatessen employee who in turn sold it to a gallery which then resold it to a buyer who took the painting to Venezuela. 68 *A.D.*2d at 142–145, 416 *N.Y.S.*2d at 255–256. The court considered all of defendant's affirmative statutory and equitable defenses as well as its factual assertions of ownership based upon good faith. It ruled that defendant art gallery was not entitled to statutory estoppel under *U.C.C.* § 2–403(2), finding, first, that the delicatessen employee, the gallery's vendor, was not an art dealer, *i. e.*, was not "a person in the business of selling goods of that kind" (*U.C.C.* § 1–201(9)); and, second, that the gallery was not "a person [acting] . . . in good faith" (*U.C.C.* § 1–201(9)) in the purchase of the Utrillo since it had not exercised the conjunctive statutory requirements of "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," *U.C.C.* § 2–103(1)(b), *viz*, the gallery's indifference as to the "provenance" [3] of the painting. 68 *A.D.*2d at 145–146, 416 *N.Y.S.*2d at 257.

The *Porter* court also rejected the gallery's equitable estoppel defense, observing "that although one may not be a buyer in the ordinary course of business as defined in the Uniform Commercial Code, he may be a good-faith purchaser for value and enjoy the protection of precode [*sic*] estoppel." *Id.* at 147, 416 *N.Y.S.* 2d at 258 (citation omitted). Nevertheless, the court concluded that plaintiffs had vested in the bailee (who sold to the delicatessen employee) nothing more than possession, which "without more is insufficient to create an estoppel." *Id.* at 148, 416 *N.Y.S.*2d at 259 (citation omitted).

Finally, in assessing defendant's ownership claims in that case, the *Porter* court concluded that the gallery did not qualify as a "good faith purchaser," since it had not investigated the prove-

---

[3] The "history of ownership or the right to possess or sell an object [*sic*] d'art." 68 *A.D.*2d at 146, 416 *N.Y.S.*2d at 257.

nance of the Utrillo painting. *Id.* at 149, 416 *N.Y.S.2d* at 259. The language of the court is instructive in this regard:

> The . . . claim that the failure to look into Wertz's authority to sell the painting was consistent with the practice of the trade does not excuse such conduct. This claim merely confirms the observation of the trial court that "in an industry whose transactions cry out for verification of . . . title . . . it is deemed poor practice to probe . . . ." Indeed, commercial indifference to ownership or the right to sell facilitates traffic in stolen works of art. Commercial indifference diminishes the integrity and increases the culpability of the apathetic merchant. In such posture, [the gallery] cannot be heard to complain. [*Ibid.*]

Equitable considerations have special pertinency in the instant proceedings. They appropriately require the fullest exposure of all facets of the controversy: the uniqueness of the chattels—paintings created by a renowned artist whose artworks have in general grown greatly in value; the theft or mysterious disappearance of these paintings several decades ago; the subsequent possession and enjoyment of the paintings by the Frank family; Frank's subsequent attempts to sell the paintings, and their eventual acquisition by Snyder; the experience and status of Snyder in the art world, and whether he sufficiently investigated the provenance of the O'Keeffe paintings and acted with commensurate due care and reasonable prudence when he purchased them.[4] The difficulties caused by the lengthy interim between the original disappearance of the paintings and their ultimate surfacing in Snyder's gallery also has a definite bearing upon the equities in this case.[5] These considerations, I believe,

---

[4]Authority relied on here by the majority recognizes the responsibilities of experienced and knowledgeable persons in the art world, *viz*: "If the object is a work of a living artist [,] it may be that no one can be an innocent purchaser from a seller who lacks a provenance without at least calling the artist." Ward, "Adverse Possession of Loaned and Stolen Objects: Is Possession Still 9/10ths of the Law?," in *Legal Problems of Museum Administration* 83, 96 (ALI–ABA 1980). Moreover, "[a]s experts [,] the court will expect [museums] to be more familiar with how to go about this [(checking the "usual sources" to see if the work of art is stolen)] than the average innocent purchaser." *Ibid.*

[5]There is no compelling reason why courts or parties should suffer the "Ames anomaly" referred to by the majority in support of its thesis. Ames, "The Disseisin of Chattels," 3 *Harv.L.Rev.* 313, 323 (1890). *Ante* at 504. To

should be given direct application as constituent elements of the primary claims and the affirmative defenses of the parties rather than be given at most, as required by the majority opinion, oblique application as an aspect of the discovery rule relevant only as to whether O'Keeffe is entitled to assert a claim for the stolen paintings.

## IV

I am mindful that the majority is concerned with the importance of the policy of repose and the discouragement of stale claims. At times, however, these policies must yield to other equally important policies. Compare, for example, *Velmohos v. Maren Engineering Corp.*, 83 *N.J.* 282, 293 (1980), with *Galligan v. Westfield Centre Service, Inc.*, 82 *N.J.* 188, 192–193 (1980). The majority has in this case gone well beyond a simple and understandable desire for quietude in litigation. It has actually placed the entire burden of proof as to the absence of comparative fault upon the original owner-artist, albeit in the sheep's clothing of the discovery rule. *Ante* at 492–494, 499–500. I see no justification for removing that burden from the defendant, who may assert equities in his favor to establish his entitlement to the artwork. Ward, *supra* at 96. I respectfully repeat that the Court's anxiety in this regard can be fully and properly accommodated in this case without first fictionalizing the tortious character of Snyder's conversion and then applying as the only pertinent statute of limitations that which was triggered as of the date of the original theft, subject to an artificial and novel extension of the discovery rule, all of which does not really allow the parties to get to the heart of the matter.

All of the factors which trouble the majority, I suggest, can and should be addressed in the context of a remand directing

the extent that it appears that O'Keeffe's claims against any person in possession prior to Snyder would have been barred under the statute of limitations, this factor would constitute a potent, if not dispositive, equity in favor of Snyder.

the trial court to consider the defendant's affirmative defenses, to recognize that defendant bears the burden of proof with respect to those defenses, and, ultimately, to weigh the respective interests of the parties by balancing the equities in order to determine who should bear the loss of the paintings.

For these reasons, I dissent.

*For reversal and remandment* —Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER and POLLOCK —5.

*For affirmance* —Justices SULLIVAN and HANDLER—2.