SAMUEL PORTER et al., Appellants, v PETER WERTZ et al., Individually and Trading Under the Name of IRVIN BRENNER GALLERY, et al., Defendants, and RICHARD FEIGEN GALLERY, INC., et al., Respondents.

First Department, May 10, 1979

### APPEARANCES OF COUNSEL

*Bernard Weitzman* of counsel *(A. Harry Kupersmith,* attorney), for appellants.

*George Popkin* for respondents.

### OPINION OF THE COURT

BIRNS, J.

Plaintiffs-appellants, Samuel Porter and Express Packaging, Inc. (Porter's corporation), owners of a Maurice Utrillo painting entitled "Chateau de Lion-sur-Mer", seek in this action to recover possession of the painting or the value thereof from defendants, participants in a series of transactions which resulted in the shipment of the painting out of the country. The painting is now in Venezuela.

Defendants-respondents Richard Feigen Gallery, Inc., Richard L. Feigen & Co., Inc., and Richard L. Feigen, hereinafter collectively referred to as Feigen, were in the business of buying and selling paintings, drawings and sculpture.

The amended answer to the complaint asserted, *inter alia,* affirmative defenses of statutory estoppel (Uniform Commer-

cial Code, § 2-403) and equitable estoppel.[1] The trial court, after a bench trial, found statutory estoppel inapplicable but sustained the defense of equitable estoppel and dismissed the complaint.

■ ■ On this appeal, we will consider whether those defenses, or either of them, bar recovery against Feigen. We hold neither prevents recovery.[2]

Porter, the owner of a collection of art works, bought the Utrillo in 1969. During 1972 and 1973 he had a number of art transactions with one Harold Von Maker who used, among other names, that of Peter Wertz.[3] One of the transactions was the sale by Porter to Von Maker in the spring of 1973 of a painting by Childe Hassam for $150,000, financed with a $50,000 deposit and 10 notes for $10,000 each. At about that time, Von Maker expressed an interest in the Utrillo. Porter permitted him to have it temporarily with the understanding that Von Maker would hang it in his (Von Maker's) home,[4] pending Von Maker's decision whether to buy the painting. On a visit to Von Maker's home in Westchester in May, 1973, Porter saw the painting hanging there. In June, 1973, lacking a decision from Von Maker, Porter sought its return, but was unable to reach Von Maker.

The first note in connection with Von Maker's purchase of the Childe Hassam, due early July, 1973, was returned dishon-

---

1. The defense of equitable estoppel was not contained in the original answer. At the close of the trial, Feigen moved to amend the answer to include that defense. We are not at all certain that amendment of the pleading should have been allowed at that point. In any event, as the defense was raised, we will consider it.

2. We note that the appeal is from the trial court's determination that equitable estoppel constitutes a bar to the action. However, because the enactment of statutory estoppel (Uniform Commercial Code, § 2-403) was intended to embrace prior uniform statutory provisions and case law thereunder (so as "to continue unimpaired all rights acquired under the law of agency or of apparent agency or ownership or other estoppel"), and to state a unified and simplified policy on good faith purchase of goods (see Official Comment, McKinney's Cons Laws of NY, Book 62½, Uniform Commercial Code, § 2-403, p 395), we find it necessary to enter into some discussion of section 2-403 of the Uniform Commercial Code.

3. As will be seen, Peter Wertz was a real person, at least an acquaintance of Von Maker; who permitted Von Maker to use his name. Von Maker's true name was Harold Maker, presumably he was born in New Jersey. Apparently Maker added the prefix "Von" to his name to indicate nobility of birth.

4. It is questioned as to where Porter believed Von Maker was living at the time. Respondents claim Porter knew only that Von Maker had a townhouse in Manhattan, whereas Porter testified he was aware Von Maker had two residences, one of them being in Westchester County. There is no support in the record for the trial court's finding that the painting was to be hung only in the Manhattan townhouse.

ored, as was the balance of the notes. Porter commenced an investigation and found that he had not been dealing with Peter Wertz—but with another man named Von Maker. Bishop reports, dated July 10 and July 17, 1973, disclosed that Von Maker was subject to judgments, that he had been sued many times, that he had an arrest record for possession of obscene literature, and for "false pretenses", as well as for "theft of checks", and had been convicted, among other crimes, of transmitting a forged cable in connection with a scheme to defraud the Chase Manhattan Bank and had been placed on probation for three years. Porter notified the FBI about his business transactions concerning the notes. He did not report that Von Maker had defrauded him of any painting, for, as will be shown, Porter did not know at this time that Von Maker had disposed of the Utrillo.

Porter did, however, have his attorney communicate with Von Maker's attorney. As a result, on August 13, 1973, a detailed agreement, drawn by the attorneys for Porter and Von Maker, the latter still using the name Peter Wertz, was executed. Under this agreement the obligations of Von Maker to Porter concerning several paintings delivered by Porter to Von Maker (one of which was the Utrillo) were covered. In paragraph 11, Von Maker acknowledged that he had received the Utrillo from Porter together with a certain book[5] on Utrillo, that both "belong to [Porter]", that the painting was on consignment with a client of Von Maker's, that within 90 days Von Maker would either return the painting and book or pay $30,000 therefor, and that other than the option to purchase within said 90-day period, Von Maker had "no claim whatsoever to the Utrillo painting or Book".

Paragraph 13 provided that in the event Von Maker failed to meet the obligations under paragraph 11, i.e., return the Utrillo and book within 90 days or pay for them, Porter would immediately be entitled to obtain possession of a painting by Cranach held in escrow by Von Maker's attorney, and have the right to sell that painting, apply the proceeds to the amount owing by Von Maker under paragraph 11, and Von Maker would pay any deficiency. Paragraph 13 provided further that "[t]he above is in addition to all [Porter's] other rights and remedies, which [Porter] expressly reserved to

5. The book, entitled "Petrides on Utrillo", was purchased by Porter in 1971 in Paris for the sum of $200.

enforce the performance of [Von Maker's] obligations under this Agreement."

We note that the agreement did not state that receipt of the Cranach by Porter would be in full satisfaction of Porter's claim to the Utrillo and book. Title to the Utrillo and book remained in Porter, absent any payment by Von Maker of the agreed purchase price of $30,000. Indeed, no payment for the Utrillo was ever made by Von Maker.

At the very time that Von Maker was deceitfully assuring Porter he would return the Utrillo and book or pay $30,000, Von Maker had already disposed of this painting by using the real Peter Wertz to effect its sale for $20,000 to Feigen. Von Maker, utilizing Sloan and Lipinsky, persons in the art world, had made the availability of the Utrillo known to Feigen. When Wertz, at Von Maker's direction, appeared at the Feigen gallery with the Utrillo, he was met by Feigen's employee, Mrs. Drew-Bear. She found a buyer for the Utrillo in defendant Brenner. In effecting its transfer to him, Feigen made a commission. Through a sale by Brenner the painting is now in Venezuela, South America.

■ We agree with the conclusion of the trial court that statutory estoppel does not bar recovery.

The provisions of statutory estoppel are found in section 2-403 of the Uniform Commercial Code. Subdivision (2) thereof provides that "[a]ny entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." Subdivision (9) of section 1-201 of the Uniform Commercial Code defines a "buyer in the ordinary course of business" as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind".

In order to determine whether the defense of statutory estoppel is available to Feigen, we must begin by ascertaining whether Feigen fits the definition of "a buyer in the ordinary course of business". (Uniform Commercial Code, § 1-201, subd [9].) Feigen does not fit that definition, for two reasons. First, Wertz, from whom Feigen bought the Utrillo, was not an art dealer—he was not "a person in the business of selling goods of that kind". (Uniform Commercial Code, § 1-201, subd [9].) If

anything, he was a delicatessen employee.[6] Wertz never held himself out as a dealer. Although Feigen testified at trial that before he (Feigen) purchased the Utrillo from Wertz, Sloan, who introduced Wertz to Feigen told him (Feigen) that Wertz was an art dealer, this testimony was questionable. It conflicted with Feigen's testimony at his examination before trial where he stated he did not recall whether Sloan said that to him.[7] Second, Feigen was not "a person * * * in good faith" (Uniform Commercial Code, § 1-201, subd [9]) in the transaction with Wertz. Section 2-103 (subd [1], par [b]) of the Uniform Commercial Code defines "good faith" in the case of a merchant as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Although this definition by its terms embraces the "reasonable commercial standards of fair dealing in the trade", it should not—and cannot—be interpreted to permit, countenance or condone commercial standards of sharp trade practice or indifference as to the "provenance", i.e., history of ownership or the right to possess or sell an object d'art, such as is present in the case before us.

We note that neither Ms. Drew-Bear nor her employer Feigen made any investigation to determine the status of Wertz, i.e., whether he was an art merchant, "a person in the business of selling goods of that kind." (Uniform Commercial Code, § 1-201, subd [9].) Had Ms. Drew-Bear done so much as call either of the telephone numbers Wertz had left, she would have learned that Wertz was employed by a delicatessen and was not an art dealer. Nor did Ms. Drew-Bear or Feigen make an effort to verify whether Wertz was the owner or authorized by the owner to sell the painting he was offering. Ms. Drew-Bear had available to her the Petrides volume on Utrillo which included "Chateau de Lion-sur-Mer" in its catalogue of

---

6. Wertz is described as a seller of caviar and other luxury food items (because of his association with a Madison Avenue gourmet grocery) and over whom the Trial Term observed, Von Maker "cast his hypnotic spell * * * and usurped his name, his signature and his sacred honor."

7. Feigen's explanation for his changed version was that after his examination before trial and before the trial, his memory was "jogged" by Lipinsky, who had introduced Sloan to Feigen.

In connection with Feigen's claim that Wertz was a dealer, it is observed that on a previous appeal (Porter v Wertz, 56 AD2d 570), this court unanimously affirmed an order of Special Term denying appellants' motion for summary judgment in that there was an issue of fact as to whether Wertz was a dealer or a collector. If a dealer, appellants claimed, as they do now, the applicability of subdivision (2) of section 2-403 of the Uniform Commercial Code.

the master's work.[8] Although this knowledge alone might not have been enough to put Feigen on notice that Wertz was not the true owner at the time of the transaction, it could have raised a doubt as to Wertz' right of possession, calling for further verification before the purchase by Feigen was consummated. Thus, it appears that statutory estoppel provided by subdivision (2) of section 2-403 of the Uniform Commercial Code was not, as Trial Term correctly concluded, available as a defense to Feigen.

■ We disagree with the conclusion of the trial court that the defense of equitable estoppel (see *Zendman v Harry Winston, Inc.,* 305 NY 180) raised by Feigen bars recovery.

We pause to observe that although one may not be a buyer in the ordinary course of business as defined in the Uniform Commercial Code, he may be a good-faith purchaser for value and enjoy the protection of precode estoppel (see *Tumber v Automation Design & Mfg. Corp.,* 130 NJ Super 5, 13; Uniform Commercial Code, § 1-103). We now reach the question whether the defense of equitable estoppel has been established here.

In general terms: "Equitable estoppel or estoppel in pais is the principle by which a party is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion were allowed. An estoppel in pais can arise only when a person, either by his declarations or conduct, has induced another person to act in a particular manner. The doctrine prohibits a person, upon principles of honesty and fair and open dealing, from asserting rights the enforcement of which would, through his omissions or commissions, work fraud and injustice." (21 NY Jur, Estoppel, § 15 [citing cases].)

As the Court of Appeals reiterated in *Zendman v Harry Winston, Inc. (supra,* p 185), an " 'owner may be estopped from setting up his own title and the lack of title in the vendor as

---

8. Page 32 of that book clearly contained a reference to the fact that that painting, at least at the time of publication of the book in 1969, was in the collection of Mrs. Donald D. King of New York, supposedly the party from whom Porter obtained it.

against a *bona fide* purchaser for value where the owner has clothed the vendor with possession and other indicia of title, 46 *Am. Jur., Sales,* § 463.'" Indeed, "[t]he rightful owner may be estopped by his own acts from asserting his title. If he has invested another with the usual evidence of title, or an apparent authority to dispose of it, he will not be allowed to make claim against an innocent purchaser dealing on the faith of such apparent ownership" *(Smith v Clews,* 114 NY 190, 194).

In *Zendman v Harry Winston, Inc. (supra),* a diamond merchant in New York City sent a ring to Brand, Inc., a corporation which conducted auctions on the boardwalk in Atlantic City, New Jersey, with a memorandum reciting that the ring was for examination only and that title was not to pass until the auctioneer had made his selection, and had notified the sender of his agreement to pay the indicated price and the sender had indicated acceptance thereof by issuing a bill of sale. The ring was placed in a public show window at the auctioneer's place of business, remaining there for more than a month, before being sold to the plaintiff at a public auction. Under circumstances where it was demonstrated that the defendant had permitted other pieces of jewelry it owned to be exhibited and sold by the auctioneer, it was held that the defendant by his conduct was estopped from recovering the ring from the plaintiff.

In the case at bar, Porter's conduct was not blameworthy. When the first promissory note was dishonored, he retained Bishop's investigative service and informed the FBI of the financial transactions concerning the series of notes. His attorney obtained a comprehensive agreement covering several paintings, within which was the assurance (now proven false) by Von Maker that he still controlled the Utrillo. Although Porter had permitted Von Maker to possess the painting, he conferred upon Von Maker no other indicia of ownership. Possession without more is insufficient to create an estoppel *(Zendman v Harry Winston, Inc., supra,* pp 186-187).

We find that the prior art transactions between Porter and Von Maker justified the conclusion of the trial court that Porter knew that Von Maker was a dealer in art. Nevertheless, the testimony remains uncontradicted, that the Utrillo was not consigned to Von Maker for business purposes, but rather for display only in Von Maker's home (cf. *Zendman v Harry Winston, Inc., supra).* In these circumstances, it cannot

be said that Porter's conduct in any way contributed to the deception practiced on Feigen by Von Maker and Wertz.

Finally, we must examine again the position of Feigen to determine whether Feigen was a purchaser in good faith.

In purchasing the Utrillo, Feigen did not rely on any indicia of ownership in Von Maker. Feigen dealt with Wertz, who did not have the legal right to possession of the painting. Even were we to consider Wertz as the agent of Von Maker or merge the identities of Von Maker and Wertz insofar as Feigen was concerned, Feigen was not a purchaser in good faith. As we have commented, neither Ms. Drew-Bear nor Feigen made, or attempted to make, the inquiry which the circumstances demanded.

The Feigen claim that the failure to look into Wertz' authority to sell the painting was consistent with the practice of the trade does not excuse such conduct. This claim merely confirms the observation of the trial court that "in an industry whose transactions cry out for verification of * * * title * * * it is deemed poor practice to probe". Indeed, commercial indifference to ownership or the right to sell facilitates traffic in stolen works of art. Commercial indifference diminishes the integrity and increases the culpability of the apathetic merchant. In such posture, Feigen cannot be heard to complain.

In the circumstances outlined, the complaint should not have been dismissed. Moreover, we find (CPLR 4213, subd [b]; 5712, subd [c], par 2) that plaintiffs-appellants are the true owners of the Utrillo painting and are entitled to possession thereof, that defendants-respondents wrongfully detained that painting and are obligated to return it or pay for its value at the time of trial (CPLR 7108, subd [a]; 10 Fuchsberg, New York Law of Damages, § 934; 7A Weinstein-Korn-Miller, NY Civ Prac, par 7108.02, and cases cited).

In view of the inconclusive nature of the evidence at trial as to damages (the painting apparently being irretrievable), that sole issue remains to be determined. Further, plaintiffs-appellants may have obtained the proceeds from a sale of the Cranach (as to which we have no information) and that could be a credit against those damages.

Accordingly, the judgment of the Supreme Court, New York County (SHORTER, J.), entered June 22, 1978, should be reversed and vacated, on the law and the facts, the complaint reinstated, judgment entered in favor of plaintiffs-appellants

on liability, and the matter remanded for an assessment of damages, with costs and disbursements to plaintiffs-appellants.

KUPFERMAN, J. P., LANE and SILVERMAN, JJ., concur.

Judgment, Supreme Court, New York County, entered on June 23, 1978, reversed, on the law and the facts, and vacated, the complaint reinstated, judgment entered in favor of plaintiffs-appellants on liability, and the matter remanded for an assessment of damages. Appellants shall recover of respondents $75 costs and disbursements of this appeal.