**Edward A. CANTOR, Plaintiff,**

v.

**Dennis R. ANDERSON, Mark Umbach and Anderson Fine Arts, Inc., Defendants.**

**Wildenstein & Co., Inc., Intervenor-Defendant.**

**No. 84 Civ. 0982 (RWS).**

United States District Court, S.D. New York.

June 16, 1986.

Swidler & Swidler, P.C., New York City, for plaintiff; Steven A. Swidler, of counsel.

Richard K. Bernstein Associates, P.C., New York City, for Intervenor-defendant; Richard K. Bernstein, of counsel.

SWEET, District Judge.

The plaintiff, Edward A. Cantor ("Cantor"), brought this action against Dennis R. Anderson ("Anderson"), Mark Umbach ("Umbach") and Anderson Fine Arts, Inc. ("AFA") in which Wildenstein & Co., Inc. ("Wildenstein") intervened to seek the return of a Renoir drawing entitled "Gabrielle Couchee a la Rose" (the "Renoir") or its stated price $160,000.

The acumen and integrity of art dealers are the foundation stones of the market for fine art. Without these pillars the market could not function, and transactions based on trust and taste could not be accomplished. However, sometimes in the interests of all concerned a cracked stone is cemented over, but in this instance Anderson and his company AFA crumbled under financial pressure, leaving the Renoir in the hands of Cantor but subject to the claim of the Wilderstein Gallery that had consigned it to Anderson. Based on the facts and conclusions set forth below, judgment will be granted to Wildenstein.

### Prior Proceedings

Cantor, a New Jersey resident, businessman and art collector, commenced this diversity action against Anderson, Umbach and AFA on February 9, 1984, alleging damages of $129,000. Umbach was never served and is not subject to the jurisdiction of this court.

On October 3, 1984, Wildenstein intervened, counterclaiming against Cantor for conversion of the Renoir. By March, 1985, Anderson and AFA each filed separate, voluntary petitions seeking relief and protection under the Bankruptcy Act. Cantor and Anderson and AFA reached a settlement and consented to the entry of judgment in the amount of $99,000, which was approved on February 24, 1986, on consent of all parties. The bench trial of Wildenstein's counterclaims was held by the court on February 24, 1986 and it was finally submitted on April 11, 1986.

### Facts

Anderson is likeable, intelligent, graduate of the Greensboro College who attended the University of Virginia in 1972, and received a degree of Master of Fine Arts from the University of North Carolina. He served as curator for a recognized museum for three years, and as an assistant director of an established gallery for four years during which time he authored several publications on the subject of his specialties. In 1980 he established AFA as a private art dealer and consultant, doing appraisals, research and advising collectors and auction houses. He did not maintain a gallery or an ownership interest in works of substantial value. In February, 1984 he was arrested, and later convicted, for his fraudulent conduct of the business of AFA and is currently serving a term of imprisonment in the state system.

Cantor, who for thirty-five years has been a successful contractor, owner and operator of real estate, met Anderson at a dinner party in New Jersey in late 1981, where the two engaged in conversation which revealed a mutual interest in art and collecting. Anderson viewed the Cantor's collection and left them with his book "American Flower Paintings." It was agreed that Anderson would assist the Cantors to upgrade their collection, and to that end a course of dealing ensued. Anderson would sell works to Cantor, and Cantor would consign works to Anderson for sale. Both parties were familiar with the consignment procedure and approximately fifty to sixty transactions were accomplished between them until at the end of their relationship Cantor had acquired, not solely through Anderson, a collection insured for over $1,900,000.

By the fall of 1983, Anderson had taken possession of a bronze statute by Jacques Lipshitz entitled "Half Standing Figure" and agreed to pay Cantor $45,000 net or return the statue to Cantor on five days notice. By November 27, Cantor obtained a written confirmation from Anderson that the balance owed on their open account was $19,000 to be made good by December 2, 1983, which it was not. In December, 1983 Anderson took possession of a painting by Maurice Prendergast entitled "Seascape" and again agreed to pay Cantor $45,000 net or return the painting to Cantor on five days notice. Additionally, Anderson took possession of a painting by Maurice Vlaminck entitled "Street in Montmarte" and agreed to pay Cantor $20,000 net or return the painting on five days notice.

On December 8, 1983, Anderson delivered Cantor's Prendergast painting entitled "Seascape" to Gallery Bellman as security for a debt owed by Anderson to Gallery

Bellman in the amount of $36,000. Anderson sold the Vlaminck to a Mr. Avram Lebor and sold the Lipshitz statue between December 4, 1983 and January 1, 1984 and never disclosed the sale to Cantor.

Confronted with consistent past slow payments and doubts about the story being told to him about the Lipshitz, and his inability to verify the situation with respect to the articles consigned, Cantor became increasingly apprehensive, despite his knowledge that Anderson's co-worker, Umbach, came from a well-to-do family.

In December Anderson showed Cantor a transparency of the Renoir which he had obtained on written consignment from Wildenstein. The provenance of the work did not include a bill of sale since it had been acquired in Europe ten or fifteen years ago and had been held in inventory since that time and was covered by Wildenstein's floater insurance. Anderson was quoted a sale price of $160,000 by Wildenstein. According to Cantor, he did not like the work and would not take it "on a bet."

By January 4, 1983 Cantor had consulted with attorneys and demanded the return of the consigned works and on January 6 demanded either cash or security from Anderson to forebear any longer. Anderson sent the Renoir and a Dubuffet to Cantor's home on January 6. Cantor refused to sign a receipt for the Renoir, and Anderson directed that it be left by the delivery service. No contemporaneous written document exists describing the ownership of the pictures other than the directions to the delivery service.

According to Cantor, Anderson represented that he owned the Renoir. According to Anderson, he made no representation of ownership. Cantor, seeking security and comfort, heard what he wanted to hear and Anderson did not clarify or refute his understanding.

By February 2, Cantor sent a mailgram demanding the payment of his debt upon threat of complaint to the authorities. By the end of the month Anderson was under arrest and the Renoir was in Cantor's bedroom, face to the wall.

## Conclusions

### Pledge

According to Cantor, Anderson pledged the Renoir to him in satisfaction of the antecedent debt and Cantor perfected a security interest in the painting through possession pursuant to U.C.C. § 9–305 which provides in relevant part:

> A security interest in .... goods ... may be perfected by the secured party's taking possession of the collateral ... A security interest is perfected by possession from the time possession is taken without relation back, and continues only so long as possession is retained, unless otherwise specified in this article ...

Possession of secured goods does obviate the need to have a written security agreement describing the collateral and the need to file a financing statement in order to perfect a security interest, U.C.C. § 9–203(1)(a), Comment 1, U.C.C. § 9–402. However, Cantor's reliance on possession of the Renoir in accordance with this section is misplaced in two respects.

First, although Cantor describes this transaction as a pledge, the parties' course of dealing cast doubt on whether the parties "intended to create a security interest in personal property" within the scope of Article 9. U.C.C. § 9–102(1)(a), Comment 1. The circumstances surrounding the delivery of the Renoir placed a duty upon Cantor to inquire into the painting's ownership. The Civil Court of New York County has recently imposed a duty on the party acquiring artwork to inquire as to proper title. In *Howley v. Sotheby's, Inc.*, N.Y. L.J., February 20, 1986, Civil Court, New York County, (also a conversion action), the defendant purchased plaintiff's lithograph from a thief who represented himself as the plaintiff's nephew and agent. The court found that the circumstances surrounding the purchase of the lithograph were such that the defendant, an art dealer, was obligated to investigate the transaction scrupulously to insure its legitimacy. Because the purchaser did not investigate the transaction, as he was obligated to do,

he was liable to the plaintiff for conversion of the lithograph.

Here Cantor was aware of Anderson's financial difficulties and had reason to doubt Anderson's ownership of a Renoir valued at approximately $160,000. Cantor was familiar with Anderson's practice of selling works on consignment, and circumstances were such to require Cantor to obtain some confirmation of what he wished to believe Anderson had stated. A pledge of collateral as security for a preexisting debt needs more than a disputed telephone call.

Second, while possession may *perfect* a security interest in goods pursuant to U.C.C. 9–302(1)(a), a security cannot *attach* until the debtor has "rights in the collateral" pursuant to U.C.C. § 9–203(1)(c) and U.C.C. § 9–204(1). Cantor contends that Anderson had such rights in the collateral because Wildenstein "entrusted" the painting to Anderson and because the artworks were the type of consignment goods which could be reached by Anderson's creditors. The evidence at trial demonstrated that Anderson did not have any such rights to transfer to Cantor and that Wildenstein did not directly grant such a lien to Cantor.

**Entrustment**

■ Cantor claims that Anderson had rights in the collateral to transfer, because Wildenstein "entrusted" the painting to Anderson, who transferred it to Cantor, a buyer in the ordinary course of business. U.C.C. Section 2–403(2) provides:

> Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business.

However, Section 1–201(9) defines a "Buyer in the ordinary course of business" to exclude a person who receives the goods "in total or partial satisfaction of a money debt," as Cantor has admitted here.

**Consignment**

Cantor has not established that Wildenstein entrusted Anderson with the Renoir for resale in compliance with U.C.C. § 2–

326, effecting a consignment sale under this section and entitling the Anderson's creditors to obtain a lien on the property. Consignment sales described in Section 2–326(3) render the goods open to the claims of the buyers creditors:

> Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return ...

■ Cantor cannot claim that he could satisfy an outstanding debt to him with consignment goods under these provisions, because Anderson was not a person who "maintains a place of business at which he deals in goods of the kind involved" pursuant to 2–326(3). Cantor never saw the Renoir at Anderson's place of business but viewed transparencies and the Renoir drawing in his own home. Furthermore, Cantor is not the "general creditor" that Section 3–326(3) was designed to protect.

> [S]ubsection 3 resolves all reasonable doubt as to the nature of the transaction in favor of the general creditors of the buyer. As against such creditors words such as "on consignment" or "on memorandum" with or without words of reservation of title in the seller are disregarded when the buyer has a place of business at which he deals in goods of the kind involved. A necessary exception is made where the buyer is known to be engaged primarily in selling the goods of others ...

Official Comment 2, U.C.C. 2–326(3).

Cantor was not an unwary general creditor who did not suspect that Anderson was not the owner of the goods he generally sold, as Cantor and Anderson had had a course of dealing comprised of just such consignment sales where Cantor was the seller of the goods. Cantor knew that Anderson was in financial trouble, and Cantor retained the painting as collateral for an

antecedent debt, and not in reliance on Anderson's claims of ownership.

A case which also fell outside of U.C.C. § 2–326 and which has similar facts is *In re Mincow Bag Co.*, 53 Misc.2d 599, 279 N.Y.S.2d 306 (N.Y.Sup.1967), *aff'd*, 29 A.D.2d 400, 288 N.Y.S.2d 364 (1st Dept. 1968), *aff'd* 24 N.Y.2d 776, 300 N.Y.S.2d 115, 248 N.E.2d 26 (1969). *Mincow* provides some guidance in an area where there are very few cases. This case held that when the "consignee" never had physical possession of the goods, nor a place of business and title would remain in the "consignor" until sale, then U.C.C. § 2–326 would not apply. The Appellate Division explained "The unwary could not have been led into becoming creditors of Mincow based on any ostensible ownership of the merchandise," *Mincow*, 288 N.Y.S.2d at 366.

The purpose of U.C.C. § 2–326 is to protect creditors of a consignee of goods from hidden liens (American Law Inst. Uniform Commercial Code 1962, Official Text with Comments). Certainly, as in *Mincow*, this case does not fall within the spirit or the intent of U.C.C. § 2–326. With all of his advance notice, Cantor was not the kind of "creditor" this statute was intended to protect.

**Conversion**

The essence of this action is to recover either the Renoir or money damages. Thus, this action may be maintained under CPLR § 7101, Recovery of Chattel, or pursuant to the common law action for conversion. An action for recovery of chattel is concerned with right to possession and not title. *Wilk Enterprises, Inc. v. J.I.B. Realty Corp.*, 72 Misc.2d 507, 339 N.Y.S.2d 75 (Civil Ct.1972), and conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another. *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496 (4th Dept.1981). Conversion is any unauthorized exercise of dominion or control over the property by one who is not the owner of the property, which interferes with and is in definance of a superior or possessory right of another in the property. *Aetna Casualty & Surety Co. v. Glass*, 75 A.D.2d 786, 428 N.Y.S.2d 246 (1st Dept.1980).

To maintain a cause of action for conversion a plaintiff must establish legal ownership or an immediate superior right of possession to a specific identifiable thing and that a defendant with intent to interfere with such ownership or possession exercised dominion or actually interfered with the property to the exclusion of or in defiance of the plaintiff's rights. *Kahn v. Crames*, 92 A.D.2d 634, 459 N.Y.S.2d 941 (3d Dept.1983); *Meese v. Miller, supra,* 436 N.Y.S.2d at 500.

Despite the absence of a bill of sale, Wildenstein has an immediate superior right to the Renoir and accordingly fulfills all of the elements of conversion.

Judgment will be entered directing that Wildenstein recover possession of the Renoir or receive damages for the loss thereof with costs and disbursements.

IT IS SO ORDERED.