**MORGOLD, INC., a New York Corporation, Plaintiff,**

v.

**Fred E. KEELER, et al., Defendants.**

**No. C–92–4902–CAL.**

United States District Court,
N.D. California.

April 27, 1995.

Harry M. Weinberg, Mayer Weiner Levinson & Weinberg, Garden City, NY, for plaintiff.

Charles R. Breyer, Coblentz Cahen McCabe & Breyer, San Francisco, CA, for defendants.

## OPINION ON PROVENANCE

LEGGE, District Judge.

This case requires the court to resolve the ownership of a work of art. The word "provenance" has developed in the art world as a term for the subject of title to works of art. The case was tried to the court, sitting without a jury, and was briefed, argued, and submitted for decision.

The court heard the testimony of the witnesses and has reviewed the relevant portions of the transcripts of their testimony. The court has reviewed the exhibits which were admitted into evidence,[1] the record of the case, the briefs and arguments of counsel, and the applicable authorities.

This opinion constitutes the findings of fact and conclusions of law of this court, as provided in Rule 50(a) of the Federal Rules of Civil Procedure. The facts stated in this opinion are found to be facts, by a measure of a preponderance of the evidence.

### I.

The work of art in dispute is an oil on canvas painting, 25¼″ × 52″ by Alfred T. Bricher, entitled "Marlton's Cove, Grand Manan, Maine." Bricher was an American painter of the so-called Hudson River School, and he signed this painting in the lower left hand corner with his monogram. A description or picture of the painting appears in numerous catalogs. The authenticity of the painting is not in issue. Instead, the issue is who owns it.

The painting is presently possessed by defendant Fred E. Keeler. Plaintiff Morgold, Inc. has filed this action seeking possession of the painting, and a judicial determination that plaintiff is the owner. Keeler denies plaintiff's claims and has counter-claimed for a declaration that he is entitled to the possession and the title to the painting.

### II.

For purposes of this case, the relevant facts begin in 1987, when the painting was owned by the R.H. Love Gallery. Neither of the parties raises any question about the title to the painting prior to that date, or any question about its ownership by that gallery.

In October 1987, the Love gallery sold the painting to Altman Fine Arts, a New York art dealer, and to Andre Lopoukhine, a Boston art dealer. Each of those dealers contributed 50% of its purchase price and each acquired a one-half interest in the painting. The purchase is reflected in a written agreement dated October 1987, which states that Altman and Lopoukhine "have agreed to each purchase a half share."

The trial exhibits then reflect a January 13, 1989 bill of sale, allegedly transferring Altman's one-half interest in the painting to plaintiff Morgold. Defendant questions the authenticity of that bill of sale, and the evidence does raise questions about the genuineness of that alleged documentation. However, for purposes of this case, the court need not resolve that dispute. The dispute here is really what happened *after* Morgold allegedly acquired its interest. This case can be resolved on the assumption, which the court makes, that Morgold acquired Altman's one-half interest in the painting.

Therefore, at that stage in the chain of title, this court will assume that Morgold and Lopoukhine each owned a one-half interest.

In July 1989 Lopoukhine consigned possession of the painting to the Vose Gallery in Boston. Gary Goldinger, Morgold's sole shareholder and officer, later attempted to obtain possession of the painting from the Vose Gallery. But Vose refused to give possession to Goldinger until Vose received appropriate written instructions from both Morgold and Lopoukhine.

Apparently for the purpose of resolving whatever disputes there might have then been between them, on April 19, 1990 Morgold and Lopoukhine entered into a written

---

1. The record is unclear as to whether all of the offered exhibits have been ruled upon. It is now ordered that all exhibits which have not previously been ruled upon are admitted into evidence.

agreement. The stated purpose of the agreement was "to resolve all of their outstanding issues in and to the painting." The agreement stated that Morgold and Lopoukhine each "owns a fifty percent interest" in the painting. And it recited that each had contributed consideration of equal value towards its purchase. The agreement then set out a procedure for exhibiting and attempting to sell the painting, and dividing the proceeds of a sale.

Morgold then wrote to the Vose Gallery and told Vose that Morgold and Lopoukhine, the "co-owners of the [painting] have come to an agreement" concerning it. The letter instructed the Vose Gallery to release possession of the painting to Lopoukhine.

It is at this point that the disputed events giving rise to this litigation began. Later in 1990 Lopoukhine purported to sell the painting to Mr. Mark Grossman, a Scottsdale, Arizona businessman who is not in the art business, in exchange for the forgiveness of a debt which Lopoukhine apparently owed to Grossman. That sale by Lopoukhine allegedly breached the April 1990 agreement between Morgold and Lopoukhine in two respects. First, Lopoukhine sold the painting for less than the agreed upon price specified in the agreement. Second, Lopoukhine did not pay Morgold 50% of the benefits which Lopoukhine received from the sale (that is, the forgiveness of the indebtedness owed by Lopoukhine to Grossman).

In this case, plaintiff contends that because Lopoukhine's transaction with Grossman breached the terms of Lopoukhine's agreement with Morgold, Lopoukhine did not have the legal authority to pass title to the painting to Grossman; and hence there was no valid chain of ownership which subsequently resulted in Keeler's acquisition of the painting. Plaintiff also sued Lopoukhine in New York state court for breach of their agreement and for converting the painting. That suit is not material to this case, except for its evidentiary value in evaluating the claims of plaintiff here. In plaintiff's suit against Lopoukhine, plaintiff did not claim that the title

to the painting was vested solely in plaintiff, but instead plaintiff sued Lopoukhine for breach of their agreement "concerning the right, title and ownership interest in and to" the painting. Lopoukhine later filed for bankruptcy protection, and plaintiff continued its suit as an adversary proceeding in Lopoukhine's bankruptcy. That action was ultimately settled and dismissed.[2]

To return to the chain of title with which we are concerned here: In 1990, Grossman had possession of the painting and the purported interest in it that he had acquired from Lopoukhine. Around April 1991 Grossman contacted David Adler, a Scottsdale, Arizona antique dealer. Adler was not an art dealer, although he purchased and sold paintings as a part of his antique business. Grossman asked Adler if he knew anyone who might be interested in purchasing the painting. Grossman initially asked a high price for the painting, which discouraged any interest by Adler at that time. But by mid June 1991, Grossman offered to sell the painting, either to or through Adler, for about one-half or one-third of Grossman's original asking price.

At approximately that time, Adler contacted defendant Keeler about the painting. Adler and Keeler had done business with one another for several years, including transactions involving art. And Adler knew that Keeler was interested in and knowledgeable about early American artists such as Bricher. When Adler first contacted Keeler about the painting, Keeler believed that Grossman's asking price was still too high.

Approximately a month later, Grossman again lowered his price further. Adler had in the meantime done research on the sales prices for other Bricher paintings, and he concluded that Grossman's asking price, now $40,000, was fair. Adler again contacted Keeler and offered to sell the painting to Keeler for $45,000. It is disputed whether the $5,000 difference was a spread between two separate transactions—that is, a sale by Grossman to Adler, and then a sale by Adler to Keeler—or whether it was a $5,000 com-

mission to Adler from Keeler for Adler acting as Keeler's agent in a sale by Grossman to Keeler.

Keeler inspected the painting, and did some research into its history. He called the Vose Gallery and learned that the painting had been on display there for a high price, but had not sold. The Vose representative with whom Keeler spoke did not mention any dispute or irregularity regarding title. Keeler also called Mr. Jeffrey Brown, an expert on Bricher paintings. Brown was familiar with the painting and did not indicate that there were any title problems.

In August 1991, Keeler then acquired the painting and paid Adler $45,000. The court finds as a matter of fact that Adler was not acting simply as an agent for Keeler. Adler acted independently for himself. He purchased the painting from Grossman for his own account, although he knew that he had an immediate resale to Keeler for $5,000 more. The history of their prior transactions demonstrates the independence of Adler in dealing with Grossman, and the arm's length buying and selling relationship between Keeler and Adler.

In December 1991, Morgold's officer Goldinger contacted Keeler. Goldinger claimed that Morgold was the sole owner of the painting and that the painting had been improperly taken from Morgold. This lawsuit then followed.

### III.

These facts present the following legal issues:

First, was Lopoukhine an owner of the painting who had the power to convey good title and possession to it, even though his transfer breached his agreement with Morgold? If Lopoukhine had that power, then the subsequent sales transactions from Lopoukhine to Grossman, to Adler, and then to Keeler resulted in possession and good title being acquired by Keeler.

Second, if Lopoukhine did not have the power to convey good title to the painting, was Keeler nevertheless a good faith purchaser for value? Keeler acknowledges that he is an art dealer, and that he was therefore subject to the obligations of care imposed upon art dealers in the purchase and sale of works of art. If Keeler was a good faith purchaser, satisfying the reasonable commercial standards of an art dealer, he could acquire good title in spite of the allegedly unauthorized action of Lopoukhine.

### A.

There is surprisingly little law on the subject of title to art. There are no New York, California, Arizona or federal statutes which are applicable just to works of art. And the case authorities are few, with none in this circuit or this state.

There is no statutory system of registration or recordation for documenting and transferring title to works of art. There is nothing comparable to recording statutes for land. Indeed, art is given even less legal dignity than automobiles, for which there are statutory systems for recording ownership and transferring title. Works of art, regardless of their uniqueness and possible value, are relegated to the same legal status as ordinary chattels. The only regulation of art by statute is that governing chattels under the Uniform Commercial Code and its various state analogues. And the codes do not require bills of sale, which would at least be helpful as evidence, for the passing of title. *See* 3A R. Anderson, Uniform Commercial Code § 2–410:80, p. 548 (3d ed. 1985). Even the common law has not given works of art the distinction of a body of jurisprudence all its own.

The absence of a body of law specifically governing art may become more significant in the near future. 1995 marks fifty years since the end of World War II, and valuable art works obtained by the force of arms are emerging from hiding in cellars and attics. For example, certain "hidden" art treasures obtained during World War II have just been displayed by the Hermitage Museum in St. Petersburg and by the Pushkin Museum of Fine Arts in Moscow. *See* "The Hermitage," by Stanley Meisler, *Smithsonian Magazine,* Vol. 25, No. 12, March 1995, p. 40; *The Wall Street Journal,* April 13, 1995, p. A12.

It is because of the scarcity of a body of law dealing with art that this decision is being published. However, the court will resist the temptation of making sweeping statements of the law that *should* apply to art, and will confine itself to the resolution of this dispute—for whatever precedent value that may have.

### B.

As stated, research has disclosed no reported cases in California or in the Ninth Circuit on the title to art. This court therefore has guidance only from other jurisdictions, primarily the State of New York. The few reported decisions teach us generally that:

■ (1) Art is subject to ordinary principles of contract, where there is a contract. *See Estate of Friedman,* 64 A.D.2d 70, 407 N.Y.S.2d 999 (1978).

■ (2) Art is subject to the usual rule that a thief of property is generally not able to convey good title, even to a bona fide purchaser. *O'Keeffe v. Snyder,* 83 N.J. 478, 488, 416 A.2d 862 (1980) ("[G]enerally speaking, if the paintings were stolen, the thief acquired no title and could not transfer good title to others regardless of their good faith and ignorance of the theft"). *Accord DeWeerth v. Baldinger,* 836 F.2d 103, 106 (2nd Cir.1987), *cert. denied* 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988); *Guggenheim Foundation v. Lubell,* 153 A.D.2d 143, 550 N.Y.S.2d 618, 619–23 (1990).

■ (3) Art is also subject to the ordinary principles of the consignment and conversion of chattels. *See Mucha v. King,* 792 F.2d 602 (7th Cir.1986).

■ (4) And art is subject to any applicable provisions of the Uniform Commercial Code and the various state analogues. *See Cantor v. Anderson,* 639 F.Supp. 364 (S.D.N.Y.1986); *Porter v. Wertz,* 68 A.D.2d 141, 416 N.Y.S.2d 254 (1979), *aff'd,* 53 N.Y.2d 696, 439 N.Y.S.2d 105, 421 N.E.2d 500 (1981). In this dispute there do not appear to be any relevant differences in the versions of the Uniform Commercial Code among New York, Arizona, and California.

### IV.

■ As stated, the first legal issue is whether Lopoukhine was an owner of the painting who had the power to convey good title and possession of it, even though his conveyance breached his agreement with Morgold.

This issue is initially answered by the terms of the April 1990 written agreement between Morgold and Lopoukhine. That agreement stated that each of them owned a fifty per cent interest, that possession of the painting would be given alternatively to each of them for the purpose of selling it, and specifically that the one in possession of the painting would have the power to offer it for sale. There was an agreed-upon sales price of $175,000. However, the agreement provided that Morgold and Lopoukhine would discuss offers for less than that price. And upon a sale the proceeds were to be divided between them. Insofar as appears from the evidence, Lopoukhine exercised the power given to him by that agreement. That is, he had possession of the painting and sold it to Grossman.

The problem is that Lopoukhine sold it for less than the agreed upon price of $175,000, and apparently for no cash at all. Nor did Lopoukhine settle with Morgold for Morgold's fifty per cent interest. However, the court finds and concludes that Lopoukhine's breach of his agreement with Morgold did not destroy his power to pass title to the painting to Grossman. The fact that Lopoukhine did so in violation of his obligations to Morgold may, and indeed did, give rise to a breach of contract claim between them. But that did not eliminate his power to convey good title to Grossman.

■ The April 1990 agreement expressly provided that New York law would govern its interpretation. And under New York law, the Lopoukhine–Morgold agreement constituted a joint venture. *See Sherrier v. Richard,* 564 F.Supp. 448, 457 (S.D.N.Y.1983) (defining joint venture). The agreement contemplated a joint effort by the parties to own, possess, display and sell the painting, with each accounting to the other for the

proceeds of sale. And under the applicable New York law, the action of Lopoukhine relating to the purposes of the joint venture was binding on Morgold. *See Ingalls Iron Works Co. v. Fehlhaber Corp.,* 275 F.Supp. 623, 627–28 (N.D.N.Y.1967). ("[G]enerally the actions of one joint venturer relating to the object of the joint venture ... may be binding on the other parties as in a partnership.") Even though the authority of one joint venturer may be limited by restrictions in the agreement between the joint venturers, a third party who deals with a joint venturer without notice of those limitations is entitled to rely on the apparent authority of the one to bind the other. *Smith v. Legg,* 15 A.D.2d 15, 222 N.Y.S.2d 55, 57–58 (1961).

Although Morgold and Lopoukhine agreed between themselves on certain limitations, those limitations were not binding on third parties, such as Grossman, if he had no notice of Lopoukhine's limited authority. There is no evidence in the record that Grossman had notice of any limitations on Lopoukhine's authority to possess and sell the painting.

■ Morgold's principal argument to the contrary is that Lopoukhine "converted" the painting and therefore could not pass good title. And plaintiff cites the generally valid principle that a purchaser cannot acquire good title from a thief. However, there was no such conversion here. Lopoukhine was a co-owner of the painting. *See Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (1981). ("Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.")

Morgold also argues that, in spite of the language of the agreement, Morgold was the sole "owner" of the painting, and that Lopoukhine only had a fifty per cent interest in the *proceeds* of a sale. However, that argument is patently contrary to the language of the April 1990 written agreement. And the agreement contains an integration clause, which under New York law precludes an outside oral agreement contrary to the written agreement. *Graham v. Lansing Development Corp.,* 56 Misc.2d 1064, 290 N.Y.S.2d 590, 593 (N.Y.Sup.Ct.1968). Morgold's argument is also contrary to other documentary evidence at the trial, including Morgold's correspondence to the Vose Gallery and the suit which Morgold brought against Lopoukhine.

Morgold also contends that the April 1990 agreement was simply a consignment agreement. However, as demonstrated by the evidence discussed above, the agreement was not just a consignment. Lopoukhine was a co-owner with Morgold and was entitled to both possession and title.

The court therefore finds and concludes that Lopoukhine was a co-owner of the painting who had the power to convey good title and possession, even though his conveyance breached his agreement with Morgold. Since Lopoukhine had the power to pass title, then the sales from Lopoukhine to Grossman, to Adler, and then to Keeler resulted in good title being acquired by Keeler.

## V.

That decision having been made, it is perhaps unnecessary for this court to proceed to the second legal issue. However, in the event that this court's transcontinental interpretation of New York law is not sustained, a ruling on the second issue is appropriate. That issue is: If Lopoukhine did not have the power to convey good title to the painting, because it was a breach of his agreement with Morgold, was defendant Keeler nevertheless a good faith purchaser for value? The commercial code provides that a person with a voidable title still has the power to transfer valid title to a good faith purchaser for value. California Uniform Commercial Code Section 2403(1). This court cites to the California code, but the parties do not contend that the New York or Arizona versions of the commercial code contain any differences that are material here.

Keeler acknowledges that he is an art dealer, and he is therefore subject to the obligations of care imposed upon merchants in the trade. Commercial Code Section 2104(1). And that degree of care includes the "observance of reasonable commercial

standards of fair dealing in the trade." Commercial Code Section 2103(1)(b).

■ Keeler is a good faith purchaser for value if (1) his own inquiry into the painting met reasonable commercial standards in the art trade, or (2) Adler, the person from whom Keeler purchased, was a good faith purchaser for value. Adler is not a commercial art dealer and was therefore not required to conform to the standards of a merchant in that industry. However, because of the facts of this case, the court need not resolve the distinction between the actions of Keeler and Adler.

■ There are two reported decisions in New York interpreting the requirement of good faith in art transactions. *Porter v. Wertz*, 68 A.D.2d 141, 416 N.Y.S.2d 254 (1979); *Cantor, supra.* Neither of those cases is factually helpful here. But they both emphasize that a dealer in art must take reasonable steps to inquire into the title to a painting, particularly if there are warnings that something is wrong with a transaction. *Porter*, 416 N.Y.S.2d at 257–58; *Cantor*, 639 F.Supp. at 367–68. That requirement was also discussed by the expert witnesses in this trial. For the reasons stated below, the court finds that no warnings were apparent to either Adler or Keeler and that both conducted themselves in a manner reasonable in the art industry.

Adler was acquainted with Grossman prior to the sale of this painting. He was aware that Grossman was a successful businessman, who owned a local restaurant chain. Adler had purchased four small paintings from Grossman prior to this transaction, and there had been no problems. He learned that this painting had been purchased by Grossman from someone in Boston, in exchange for the forgiveness of a debt. He did his own research regarding the painting's value, by reviewing publications of Christie's, Sotheby's and Butterfield & Butterfield, to look for reported auction sales of comparable Bricher paintings.

Adler and Keeler knew each other and had engaged in prior transactions in paintings. Keeler was advised by Adler about what Adler knew of the history of this painting.

Keeler inspected a photograph of the painting and, as a dealer knowledgeable about American art, formed his own opinion about a reasonable price. He also called the Vose Gallery, and the Vose representative told him that the painting had been there for a year or more but had not sold. And the Vose representative did not indicate to Keeler that there was any dispute or irregularity with respect to the title. Although not communicated to Keeler, the information which Vose then had was the 1990 letter from Morgold indicating that there were no title disputes. Keeler also called Mr. Brown, an expert on Bricher paintings. Brown gave Keeler his opinion on the painting and some information about its prior history. Brown did not indicate that there were any disputes with respect to title.

The expert witnesses supported the conclusion that Keeler, and for that matter Adler, acted in conformity with acceptable commercial standards in the art industry. They confirmed that the steps taken by Keeler were adequate in the absence of other warning signals. They also confirmed that it is not the practice in the art industry, in the absence of warnings, for a buyer to require a seller to make disclosures about the chain of title or the prices paid at every link in the chain.

Plaintiff argues that there were two warnings which required Keeler to do more. One is the fact that Grossman acknowledged that he had obtained the painting in exchange for a debt forgiveness. The second was Grossman's reduction of his asking price, which was quite dramatic, over a period of several months. However, there was no evidence that acquiring an art object in exchange for debt forgiveness is unusual in the art industry. In fact, the evidence indicated that persons who buy and sell art with one another frequently have debits and credits that are offset in a subsequent purchase or sale transaction. And the drop in Grossman's asking price was not necessarily a warning signal. Adler and Keeler researched the price. It is clear that Grossman's original asking price was far above the then reasonable price for such a Bricher painting, and that the ulti-

mate sales price was within a reasonable price range for such a painting.

The two New York cases cited by plaintiff, *Porter v. Wertz* and *Cantor v. Anderson,* *supra,* do support Morgold's legal position; that is, an art dealer cannot obtain good title unless he takes reasonable steps to investigate title when there are warning signs. However, those cases do not help Morgold beyond that point. That is because the questions of whether there were warning signs, and what degree of investigation was reasonable, are factual inquiries in each case.

This court finds and concludes, based upon the record of this trial, that both Adler and Keeler responded to the available information reasonably. There were no warnings which required them to do further investigation. Specifically, the court finds and concludes that Keeler satisfied the reasonable commercial standards in the art industry, acted honestly in connection with the transaction, and is a good faith purchaser for value.

## VI.

The court therefore concludes that Keeler has the title and right to possess the painting. Morgold has no right, title or interest in the painting, in spite of Lopoukhine's breach of his agreement with Morgold. Judgment should be entered in favor of defendant and counterclaimant, and against plaintiff and counterdefendant.

IT IS SO ORDERED.